[Crim. No. 132.   Third Appellate District.—January 24, 1911.]

## THE PEOPLE, Respondent, v. T. WAH HING, Appellant.

CRIMINAL LAW—INSTRUCTION—OPINION OF GUILT—ADHERENCE UNTIL CONVINCED BEYOND REASONABLE DOUBT—PREJUDICIAL ERROR.—An instruction to the jury that if, "after a full and careful deliberation of all the evidence in the case, any one or more of you shall be of the opinion that the defendant has been proved guilty of the crime charged to a moral certainty and beyond a reasonable doubt, those of you entertaining that opinion should vote in favor of guilty and should adhere to your opinion until you are convinced beyond a reasonable doubt that you are wrong," is prejudicially erroneous, and the error is not cured by any other instructions. [Hart, J., Dissenting.]

ID.—INSTRUCTIONS AS TO "REASONABLE DOUBT" AND "PRESUMPTION OF INNOCENCE" — INCONSISTENT WITH ERRONEOUS INSTRUCTION.—

Proper instructions as to "reasonable doubt" and as to the "presumption of innocence" cannot be harmonized with the erroneous instruction, and cannot cure the prejudicial error. So long as the law clothes the defendant with the presumption of innocence, which can only be removed by evidence which produces conviction in unprejudiced minds beyond a reasonable doubt, any substantial infraction of this statutory right of the defendant should not be permitted.

ID.—INSTRUCTION IN LANGUAGE OF CODE—"MORAL CERTAINTY"—HARMONY WITH INSTRUCTIONS AS TO "REASONABLE DOUBT."—An instruction in the language of section 1826 of the Code of Civil Procedure that the law does not require such degree of proof as precludes the possibility of error, but "moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind," though it does not declare in terms the law of "reasonable doubt," yet it is not inconsistent therewith, and may be construed in connection with instructions as to the necessity of proof "beyond a reasonable doubt" in a criminal case.

ID.—ABORTION—SUFFICIENCY OF INDICTMENT.—An indictment charging the crime of abortion committed at a certain time and place, which sets forth that defendant "did then and there willfully, unlawfully and feloniously use and employ upon Mrs. Lottie Phillips, who was then and there a pregnant woman, certain instruments" specified, made of a hard and nonflexible substance, "with intent then and there and thereby to procure the miscarriage of the said Mrs. Lottie Phillips, the same not being then or there necessary to preserve the life of the said Mrs. Lottie Phillips," is sufficient to support a conviction.

ID.—OMISSION OF WORDS "THE BODY OF"—"MISCARRIAGE."—Though the indictment would have been improved if it had set forth that the instruments were used upon "the body of" the pregnant woman, yet in view of the intent charged thereby to procure her "miscarriage," the omission of the words "the body of" raises no doubt as to what was meant. A "miscarriage" cannot be procured except by some means applied to the body of the pregnant woman.

ID.—PREPARATION FOR DEFENSE—CONVICTION A BAR.—There was no such indefiniteness in the indictment as would prevent the defendant from fully preparing his defense, or to preclude his conviction thereunder from being a bar to a subsequent prosecution or conviction of the same offense.

ID.—FATHERHOOD OF CHILD IMMATERIAL.—Where the prosecuting witness stated that she had been married for about a month, and it appeared that she was pregnant for about three months, the court properly excluded questions on cross-examination as to who was the father of the child, and as to whether any other man than her husband was its father. The relevant issue as to her pregnancy

was the fact of her being with child, and it was immaterial who was its father. Nor could the question be asked to degrade her.

ID.—ERRONEOUS CROSS-EXAMINATION OF UNWILLING WITNESS FOR DEFENSE—OFFERED BRIBE BY THIRD PARTY—REFLECTION UPON JURY. It was prejudicially erroneous to allow the cross-examination of an unwilling witness for the defense to prove that a third party offered to bribe him to testify, not shown to have been authorized by the defendant, and to prove a declaration of such third party reflecting upon the integrity of the jury. Such testimony as well as the use made of it by the district attorney in his argument could not have failed to influence the jury against the defendant to his prejudice.

ID.—CORROBORATION OF PROSECUTING WITNESS—SUFFICIENT CIRCUMSTANCES FOR JURY.—It is held that there were sufficient circumstances tending to corroborate the prosecuting witness to authorize the jury to determine their weight, and to support their verdict of conviction of the defendant.

ID.—IMPROPER STATEMENT ON CARD READ TO JURY—ORDER STRIKING OUT—INSTRUCTION.—Where a card containing proper matter for the information of the jury contained also an improper statement as to the date of the abortion by defendant, which as soon as it was read the court ordered stricken out, and instructed the jury to disregard the same, it is held that, under the circumstances, the reading thereof is not ground for reversal.

APPEAL from a judgment of the Superior Court of Sacramento County, and from orders denying a motion in arrest of judgment, and from an order denying a new trial. J. W. Hughes, Judge.

The facts are stated in the opinion of the court.

C. T. Jones, A. M. Seymour, and Archibald Yell, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

CHIPMAN, P. J.—Defendant was indicted for the crime of abortion, under section 274 of the Penal Code. A demurrer for insufficiency of facts and for failure to conform to the requirements of sections 950, 951 and 952 of the Penal Code was overruled, and the defendant pleaded not guilty, and, upon the trial, the jury returned a verdict of guilty.

Thereafter, a motion was made by defendant in arrest of judgment, which being denied, defendant moved for a new trial, which motion was denied. Defendant appeals from the orders denying his motions and from the judgment of conviction.

1. Appellant's first point is that the court erred in giving the following instruction: "If any one, or any number of you, after deliberating upon all the evidence in this case, shall be of the opinion that the defendant has not been proved to be guilty by the evidence adduced to a moral certainty and beyond a reasonable doubt, those entertaining that opinion should vote in favor of not guilty, and should so adhere to their opinion until convinced, beyond a reasonable doubt, that they are wrong.

"If, however, after a full and careful deliberation of all the evidence in the case, any one or more of you shall be of the opinion that the defendant has been proved to be guilty of the crime charged, to a moral certainty and beyond a reasonable doubt, those of you entertaining that opinion should vote in favor of guilty, and should adhere to your opinion until you are convinced beyond a reasonable doubt that you are wrong."

The error assigned lies in the concluding clause of the instruction, the claim being that "each juror was told by the instruction that if he believed the defendant had been proven guilty, he should so vote, but that he must not change his vote unless he was convinced beyond a reasonable doubt that the defendant was innocent."

Respondent makes answer in two ways: First, that the opening paragraph of the instruction being in appellant's favor, the converse and compensating paragraph at the conclusion cannot be complained of. Second, that the instructions upon the doctrine of reasonable doubt, elsewhere given, cured whatever of error there was in the instruction and renders it harmless.

It certainly cannot be seriously contended that, because an instruction has been given which is favorable to the defendant, the court may make a setoff to it by one prejudicial to him.

The second answer is based upon the well-established rule that the instructions, as a body of directions to the jury, must

be considered in their entirety; and that it is not necessary that each instruction should be a complete statement of all the rules by which the jury are to be guided. As was said in *People* v. *Besold,* 154 Cal. 369, [97 Pac. 874] : "It is impossible to declare, in each instruction, the law governing every phase of the entire case. . . . To determine whether or not the law was properly declared for the guidance of the jury, we are to look, not to an isolated excerpt from the instructions, but to the charge as a whole."

While this is true, it is also a rule that "We must take the charge together, and if, without straining any portion of the language, it harmonizes as a whole and fairly and correctly presents the law bearing on the issues tried, we will not disturb the judgment because a separate instruction does not contain all the conditions and limitations which are to be gathered from the entire text." (*People* v. *Doyell,* 48 Cal. 85, 93; *People* v. *Clark,* 84 Cal. 573, 583, [24 Pac. 313].)

The court gave the usual general instructions upon reasonable doubt. The governing principle of these general instructions upon that subject is that at all times during the deliberations of the jury and until they have arrived at a verdict, the presumption of innocence operates in favor of the defendant. (*People* v. *McNamara,* 94 Cal. 509, 514, [29 Pac. 953].) It seems to us that the instruction complained of cannot be made to harmonize with the principle thus declared. Some one of the jury, before any final vote was taken or a verdict arrived at, and at a very early stage in the deliberations, may, "after full and careful deliberation of all the evidence in the case," have reached the opinion that the defendant had been proven guilty to a moral certainty and beyond a reasonable doubt, and yet, upon further discussion of the evidence, the presumption of innocence would, under the instruction, cease to operate, and this juror would be bound to adhere to his first opinion, unless convinced beyond a reasonable doubt that he was wrong. If a juror had once voted guilty, at that moment being convinced of defendant's guilt, he could not, if he followed this instruction, change his vote to not guilty, unless convinced beyond a reasonable doubt that the defendant was innocent, and this regardless of any substantial doubt which might, after further deliberation, arise in his mind. The jury are told that after once having been

convinced beyond a reasonable doubt of defendant's guilt, that conclusion must remain fixed and immovable, throughout their further deliberations, unless that conclusion can be overcome by some view of the evidence or by some process of reasoning which admits of no reasonable doubt of the correctness of their first conclusion. Section 1096 of the Penal Code provides as follows: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal." We can see no way by which practical effect can be given to this provision of the law, if, at any time short of the final deliberations and the final vote, a juror may discard the presumption of innocence and rely upon an instruction that he is not convinced beyond a reasonable doubt of defendant's innocence, or that he was wrong in his belief first formed of defendant's guilt. (See *People* v. *Maughs,* 149 Cal. 253, 262, [86 Pac. 187].) It is the duty of the court to give this section of the Penal Code, on its own motion, though it is not error to omit it when not asked for by the defendant (*People* v. *Matthai,* 135 Cal. 442, 445, [67 Pac. 694]) ; and the jury were substantially so instructed. But such instruction implies, and the law is, as we have seen, that this presumption attends the defendant until a final verdict is reached. How, then, can we reconcile the instruction complained of with an instruction as to the presumption of innocence, or with an instruction that the defendant must be proven guilty beyond a reasonable doubt? The court instructed the jury that they were "bound to accept the law as given by the court, and apply it to the facts of the case." It seems to us that so long as the law clothes the defendant with the presumption of innocence, any substantial infraction of this right given him by statute should not be permitted. Presumption of innocence, under the law, can only be removed by evidence which produces conviction in an unprejudiced mind beyond reasonable doubt. That the instruction is prejudicial error we cannot doubt.

2. The court gave an instruction in the language of section 1826 of the Code of Civil Procedure, to the effect that the law does not require such degree of proof as excludes the possibility of error, but "moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced

mind." Defendant cites *Treadwell* v. *Whittier*, 80 Cal. 574, [13 Am. St. Rep. 175, 22 Pac. 266, 5 L. R. A. 498], and draws the conclusion, from a discussion of this section by Justices McFarland and Thornton, that it is error to give it in a criminal case; that the legislature intended, by the expression last above quoted, "to express thereby that a mere preponderance of evidence is sufficient upon which to predicate a verdict. That is to say, the legislature thereby attempted to state the difference generally between proof, strictly mathematical, and the degree of proof usually obtainable in judicial trials." In the case cited, Judge McFarland said: The legislature "did not intend to use the words [moral certainty] in that relation as synonymous with proof beyond a reasonable doubt." (See *In re Pepper's Estate* (Cal.), 112 Pac. 62.)

If it be conceded that the terms "moral certainty" are not the equivalent of and do not convey the thought embraced in the terms "beyond reasonable doubt," the instruction must be read in connection with the other instructions requiring the proof to be beyond all reasonable doubt; and when so read the jury could not have been in doubt how to apply the evidence. The situation here is quite different from that presented under the first instruction, where the general instructions cannot be made to aid or harmonize with the one complained of.

3. It is contended that the demurrer to the indictment should have been sustained.

The charging portion of the indictment is as follows: " . . . did then and there willfully, unlawfully and feloniously use and employ upon one Mrs. Lottie Phillips, who was then and there a pregnant woman, certain instruments, to wit, a long tongue-shaped instrument made of a hard and nonflexible substance, the exact length of which instrument and the character or substance of which the same was made being unknown to this grand jury, and a long, thin instrument made of a hard and nonflexible substance about fifteen inches in length and shaped like a common round lead pencil, and the character and substance of which the same was made being unknown to this grand jury, with intent then and there and thereby to procure the miscarriage of the said Mrs. Lottie Phillips, the same not being then or there necessary to

preserve the life of the said Mrs. Lottie Phillips, contrary
. . . ," etc.

The point of objection made is that although the indictment
is in the words of the statute, it is insufficient, because the
manner in which the instruments were used upon the body of
the prosecuting witness is not set forth, and hence the indict-
ment is fatally defective. *Cochran* v. *People*, 175 Ill. 28, [51
N. E. 845], is cited in support of the contention, and it must
be admitted that under a statute not much different from
ours, the court held it to be necessary to allege the manner in
which the instruments were used. In that case the indict-
ment said "did . . . administer and use on one Stella Rob-
erts . . . a certain instrument." The second count averred
"did . . . use on and administer to one Stella Roberts, etc."
The court said: "No attempt whatever is made in either count
to state how or in what manner the instrument was used 'or
administered.' Whether it was done 'by forcing, thrusting
and inserting said instrument into the private parts' or in
some other manner is wholly left to inference." It was held
that it was not sufficient to charge the offense in the language
of the statute, for the reason that the language used does not
describe the act or acts constituting the offense. To the same
effect, *Smartt* v. *State,* 112 Tenn. 539, [80 S. W. 586], and
*Commonwealth* v. *Sinclair,* 195 Mass. 100, [80 N. E. 799], are
cited.

On the other hand, respondent cites the case of *State* v.
*Bly,* 99 Minn. 74, [108 N. W. 834], where the charge was
that defendant employed "in and on the body" of Hilda
Rose, a pregnant woman, certain instruments and other means
to the grand jury unknown, with intent, etc. The indict-
ment was held sufficient. It is true that in the indictment
before us, the charge is that the instruments were used and
employed "upon one Mrs. Lottie Phillips," and not upon her
body, and it differs from the case last cited in that it does
not charge that the instruments were used *in* the prosecuting
witness, nor does it state that the manner of use was unknown
to the grand jury.

Our statute provides that every person "who uses or em-
ploys any instrument or other means whatever, with intent
thereby to procure the miscarriage," etc., is punishable, etc.
The indictment would have been improved had it charged that

the instruments were "used upon the body." Still, it seems to us that the omission of the words "the body of" raises no doubt as to what was meant, and what defendant might readily have understood to have been meant, by the language used. A miscarriage cannot well be produced except by some means applied to the body of the pregnant woman. In other respects it also seems to us that the indictment is sufficiently specific. It charges the employment of instruments, describing them, upon the woman named, she being then pregnant, with intent to procure her miscarriage, the same not being then necessary to preserve her life. We cannot see that, after a conviction under this indictment, the defendant would be in danger, through any indefiniteness in its averments, of a second conviction for the same offense, nor can we see that he was not sufficiently informed of the offense charged to enable him to prepare his defense.

4. The prosecuting witness had testified that she had been married for about a month, and it appeared that she had been pregnant for about three months. The defendant, on cross-examination, asked her who was the father of the child and also to state whether or not any other man than her husband was the father of the child. The court sustained an objection to these questions, and we think rightly. The relevant issue in respect of her pregnancy was the fact of her being with child, and it was immaterial who was the father. If the questions were asked to degrade her, they would be equally inadmissible.

5. Witness O'Brien was called for the defense. He proved to be one of those witnesses, sometimes encountered, who make statements of important facts to counsel and, when put upon the witness-stand, conveniently fail to remember any of the facts so communicated. The court, under the circumstances, permitted counsel to cross-examine the witness, and put questions with a view to his impeachment. Later, however, the court sustained an objection to his impeachment on the ground that the matter was collateral and that defendant could not impeach his own witness. After the defendant had failed to elicit any of the expected testimony from the witness, the prosecution, on cross-examination, asked him if he knew the defendant, and he said he did and also that he knew one Philip O'Neil slightly. He was then asked if he, the

witness, had visited the defendant's office, and testified that he had and that no attempt was then made to induce him to commit perjury. The following then appears in the record:

"Q. Was there any inducement made after that time or any place by any person to have you commit the crime of perjury in this case? A. Yes.

"Q. When and where? A. On the courthouse steps.

"Q. By whom? A. Philip O'Neil.

"Q. What did he say to you? A. He asked me what it would be worth for me to testify as he wanted me.

"Q. And what did you say? A. I told him 'no,' that he didn't have that kind of a man.

"Q. What else was said? A. And he walked out and stood around there for a few minutes, and then he came out and he says, 'You can go to hell.' He says, 'We don't need your testimony.'

"Q. Go ahead. Tell it all, Mr. O'Brien. A. He said, 'We have got'—

"Mr. Seymour: We object to this as irrelevant, immaterial, incompetent and not cross-examination.

"Mr. Wachhorst: It is certainly cross-examination and on the line of questions that were asked this witness on direct.

"The Court: The objection is overruled.

"Mr. Wachhorst: What was that last?

"A. He came out on the steps and he says, 'You can go to hell,' he says, 'we don't need your testimony. We have got the jury fixed.'

"Mr. Seymour: Now, we move to strike out the answer upon the grounds stated in the objection to the question.

"The Court: Denied.

"Mr. Seymour: Exception."

There was no evidence, at this or at any time, that O'Neil was authorized to make this statement, and it was not made in defendant's presence nor with his knowledge. It appeared subsequently that O'Neil had done some work in the case for defendant, but no relation was shown such as would justify the inference that O'Neil's statement was at all sanctioned by the defendant.

It seems to us that the matter brought out was not proper on cross-examination, was inadmissible, and was subject to an objection before the objection was made. The witness

should not have been permitted to complete his damaging answer over defendant's objection, and it should have been stricken out of the record on defendant's motion. The significance of the testimony may be seen in the use made of it by the assistant district attorney in his argument to the jury. We think the testimony, as well as the use made of it on the argument to the jury, could not have failed to more or less influence their minds to defendant's prejudice.

Referring to this evidence, the assistant district attorney repeated it, and, pointing to the witness then in court, who gave it, stated: "There is what confronts you, gentlemen of the jury, in considering this case. That is a thing that, as men of honor, as men of standing and reputation in this community, you should consider. It is a thing, sir, that you all resent, I believe, and you would not be a man, any one of you, if you did not resent it." How were the jury to resent the accusation that they had been "fixed" otherwise than by a verdict against the defendant, and, when appealed to by the prosecuting officer to resent the charge, how else were they to do than as demanded by him? If, in the opinion of the prosecuting officer and the court, evidence of this damaging character was not only relevant, but important, even though the statement came from a person having no license or authority from the defendant to make it, and though not made in his presence or hearing, is it not reasonable to conclude that the jury were similarly impressed?

6. When the prosecution rested the defendant moved the court to advise the jury to acquit, upon the ground that there was no legal evidence sufficiently corroborating the testimony of Mrs. Phillips, upon whom the abortion is alleged to have been performed. The motion was denied and the ruling is assigned as error. It is also claimed that at no time during the trial was there sufficient corroborating evidence. Section 1108 of the Penal Code provides that "the defendant cannot be convicted upon the testimony of the woman upon whom or with whom the offense was committed, unless she is corroborated by other evidence."

Shortly after the alleged operation, Mrs. Phillips was treated by three physicians, one visiting her at her house, and two examining and treating her at the county hospital. These witnesses testified to there being present evidences of

a miscarriage, but no one of them could testify how or by what means it was produced. Mrs. Phillips' mother went with her to some house on J street, in Sacramento, between Seventh and Eighth, but which Mrs. Phillips testified was defendant's office, on the afternoon of the day of the alleged operation, but she did not know for what purpose her daughter went there and did not then know of her pregnancy. Nor did she know the Chinaman she saw there. What took place between her daughter and this Chinaman she did not know, for it occurred in an adjoining room out of her hearing. She testified that in a few minutes she and her daughter went to some house on L street, which she could not locate, and was admitted by a woman, and about twenty minutes thereafter the "doctor," as she called him, came and he and her daughter went upstairs, the mother remaining on the first floor, and that in about twenty minutes her daughter came back and the two then left the house. She testified that she saw a Chinaman come into the hallway of the house, call her daughter, pass along the hall and upstairs, followed by her daughter, but she did not know him and could not say that he was the same person she saw at the J street house; and she was unable to say that she had ever seen the defendant at any time before the trial.

Witness Phillips, husband of the prosecuting witness, was sent by his wife to get some pills, in the evening of the day she testified to having been operated upon. He went to defendant's office on J street.

"Q. Did you have any conversation with him? A. He called me in his office.

"Q. Well, just say yes or no. A. Yes, sir.

"Q. What did he say to you? A. He wanted to know what I wanted.

"Q. What did you say? A. I told him my wife sent me here after pills.

"Q. And what did he say? A. He said, 'Oh, yes,' he remembered.

"Q. Then what? Go on with the conversation, Mr. Phillips. A. Well, then he went to get the pills. . . .

"Q. Before you got the pills, Mr. Phillips—go on and tell us about that—when he left you, or just before you got the pills? A. We were in the office at that time.

"Q. Well, go on and tell just what occurred. A. Then we went into his laboratory, and he started talking to me, wanted to know if I had the money.

"Q. What did he say? A. And I told him that I had five dollars; that was all I had.

"Q. Then what did he say? A. He wanted to know when I could give him any more. I told him I could give him some next week.

"Q. Go ahead. A. So then he gave me the pills and I gave him five dollars.

"Q. Then what did you do? A. I went home."

He also testified that after the pills were given to him "He [the doctor] took a little book from the counter and wrote down in it.

"Q. Did you see what he put on the book? A. No, sir; I couldn't tell.

"Q. Was that all the conversation you had with him at that time? A. Yes, sir.

"Q. Where did you go? A. Went home.

"Q. How many pills did he give you? A. Two.

"Q. What time did you get home that night? A. About 7 o'clock."

He testified that defendant told him to tell his wife to take the pills, but did not say how or when to take them, and that she took one of them; that he found his wife in bed. He then testified that during the night, some time after midnight, his wife passed "a clot of blood about one inch thick and two inches long" which he said was "a miscarriage." About 7 o'clock the next night she was taken to the hospital. Upon cross-examination it appeared that the witness did not tell the defendant his name nor did he tell defendant that the woman he had operated on that day sent him.

Defendant relies upon the *People* v. *Joselyn,* 39 Cal. 393. In the opinion delivered by Mr. Justice Crockett for the court, it was held as essential to conviction, where the abortion is alleged to have been performed by the use of an instrument, that the use of an instrument "is the very *gist* of the offense; and if every other fact testified to by her [the prosecuting witness] was true, the defendant was entitled to be acquitted, unless this also was true." Said the court: "On this vital point there is no corroboration whatever of the witness, Locke.

It is proved that she was pregnant and had a miscarriage; but, aside from her testimony, there is no proof whatever that any attempt was made by anyone to produce abortion, or that the miscarriage was the result of any such effort. It is not enough that the witness was corroborated in some particulars which involve no criminality in the defendant. She must also have been corroborated by circumstances, or otherwise, in at least some portion of her testimony which imputes to the defendant the commission of the crime alleged, to wit, the use of an instrument with intent to produce abortion. In this particular there was not the slightest corroboration of her testimony.''

Subsequently Judge Crockett rendered a ''supplemental opinion of the court,'' in which Justice Wallace expressed no opinion. In this supplemental opinion it was said: ''We do not intend to be understood as announcing that it is essential the witness should have been corroborated in respect to the particular method to which she testified as having been employed to produce an abortion, but it will be sufficient if she is corroborated by other testimony tending to show an attempt by the defendant to produce an abortion in any method. The *crime* consists in the attempt to produce abortion; and though the indictment in this case charges, and the witness testifies, that the defendant employed an instrument for that purpose, nevertheless, if it had been shown, for example, by other evidence, that the defendant had confessed to an attempt to produce the abortion, not by the use of instruments, but by administering a particular drug, this testimony would not only have been clearly competent, as tending to establish the criminal intent, but it would also have been a sufficient corroboration of the witness to bring the case within the requirements of the statute; for, although she would not have been corroborated in respect to the use of the instrument, she would have been corroborated as to the criminal intent, which is of the essence of the crime. The statute does not require that she should be corroborated in respect to every material fact, but only in respect to some of the material facts which constitute a necessary element of the crime alleged.''

Because the judgment of conviction was reversed, defendant seems to conclude that the supplemental opinion does not modify or weaken the force of the first opinion. As we inter-

pret the decision, the case was reversed, for the reason, as stated, "aside from her [prosecutrix's] testimony, that there is no proof whatever that any attempt was made by anyone to produce abortion, or that the miscarriage was the result of any such effort."

It is quite clear to our minds that the court did materially modify its first opinion by the supplemental opinion, for it there holds that it is not necessary that there should be corroboration of the means alleged in the indictment by which the abortion was produced, but that it is sufficient if there is corroboration as to the criminal intent, or as to the attempt to commit the crime by any means. The court distinctly recedes from its first position that the use of an instrument with intent to perform an abortion "is the very *gist* of the offense; and if every other fact testified to by her was true, the defendant was entitled to be acquitted, unless this also was true."

We think the modified view taken in the case is the correct view, and we also think the corroboration, though slight and largely circumstantial, was sufficient. Mrs. Phillips had testified that when she and her mother went to defendant's office, he examined her in a room adjoining the room where her mother was; that he inquired whether she was a married woman, and being told that she was, asked her why she wanted to get rid of her child, which she explained by stating the condition of her breasts, which, it appeared otherwise than by her own statement, had been "burnt off"; that he told her she would have to go to a certain house on L street, which she did, with her mother, and that he soon after came there and performed the operation with instruments, which she described. She became ill that same evening and took to her bed, and sent her husband to defendant after some medicine; that he went and later returned with pills which she took. It appeared, from her testimony and that of her husband, that her sickness increased and culminated in a miscarriage about 1 o'clock of that night; that her illness was serious, and the doctor who was called the next day advised taking her to the county hospital, which was done that evening. At the hospital two physicians examined her, administered ether, and treated the affected parts in a way to arrest further injurious effects from what the physicians diagnosed as a miscarriage. The jury had the right to consider the circumstance that the

15 Cal. App.—14

operation was not performed at defendant's office, but that Mrs. Phillips and her mother went to a more secluded place, where they were admitted by a woman without question, and where the operation was performed; the jury also had the right to consider the readiness shown by defendant in understanding the purpose of Mr. Phillips' coming for pills, without asking him any questions. It had appeared that defendant was to have been paid $25 for his services. The fact of his asking if Phillips had the money, his paying $5 for two pills and promising more the next week, pointed to a tacit understanding of the two men as to what had taken place between defendant and Mrs. Phillips. It may not have pointed to the use of instruments, but it did point to a resort to some means which had brought on the sickness and miscarriage of Mrs. Phillips. These circumstances, it is true, are but slight corroboration, but it was for the jury to determine their weight.

7. Witness, Dr. Harris, testified for the prosecution concerning the treatment given Mrs. Phillips at the county hospital. In the course of his examination a card was placed in his hands such as was their custom to use in recording certain facts relating to the admission of patients. Apparently the primary object, in seeking to introduce this card, was to fix the date of Mrs. Phillips' going to the hospital. Objection was made to it by defendant, because the date appeared to have been changed and this change was not accounted for. Counsel for defendant examined the card and knew what it contained; so also did the district attorney; the court also examined it but, as it stated, did not notice the objectionable entry made on it. The card was admitted over defendant's objection and showed the following: "Name: Mrs. W. Phillips. Date of entry: June 26th, 1908. Previous history: Abortion done by T. Wah Hing, June 25th, 1908."

"Mr. Seymour: Does your Honor rule that is admissible in evidence?

"The Court: No; I didn't know that was on there, I admit I had not read it.

"Mr. Yell: I move to strike out that portion of it.

"The Court: I think that is proper. That will be stricken out, gentlemen of the jury. Disregard it. It is hearsay evidence and not admissible. I did not know that was on the

card.  I had not examined it myself.  I understood from the
gentlemen that such statements were on the other side of the
card.

"Mr. Jones: That is the very thing I objected to.

"The Court: Disregard it, gentlemen of the jury."

The court then read that portion of the card deemed admissible.  The matter objected to was obviously inadmissible and
was obviously prejudicial to defendant.  But it appears to
have been read to the jury through inadvertence.  All the
attorneys present knew it was on the card.  The district
attorney ought himself to have avoided reading or having it
read, and defendant's attorneys should have been alert in
seeing that it was not read.  If we were satisfied that the district attorney purposely got the entry before the jury, we
should be inclined to treat it as prejudicial error.  The court,
doubtless, had its attention been called to it, would have
given direction not to read that part of the card.  We cannot, under the circumstances, however prejudicial the statement was, find in it cause for a reversal of the judgment.

There are some other assignments of error of more or less
importance, but they relate to the admission of evidence which
may not be again offered should there be a retrial of the case.

For the reasons already pointed out, the judgment and
order are reversed.

Burnett, J., concurred.

HART, J., Concurring.—I concur in the judgment on the
ground that the ruling of the court allowing in evidence the
declaration of Philip O'Neil to the witness O'Brien was palpably erroneous, and prejudicial to the defendant.  It is very
clear, as Justice Chipman points out, that the declaration of
O'Neil to the effect that the defendant had the jury "fixed,"
from which declaration the inevitable implication is that the
jury had been corruptly influenced to find in favor of the
defendant, regardless of the evidence, could not in any degree
bind the defendant under any known rule of law, it not
having been made in his presence or shown to have been made
by his authority or with his knowledge or consent.  Nothing
could be more obvious than that the effect of the testimony was
to greatly prejudice the rights of the accused, and that it was
regarded as a fact of persuasive significance is evidenced by

the stress laid upon it by the assistant district attorney in his address to the jury. The proposition may safely be laid down without the least apprehension of probable confutation that the average juror, having listened to testimony showing or tending to show that he had, while the case was still pending, entered into an agreement to return a certain verdict, would thus be influenced to decide the case in opposition to the result which it was charged he had agreed to bring about, whether the evidence justified such decision or not. In the case at bar, the assistant district attorney vigorously insisted that the jury should resent the charge involved in O'Neil's alleged declaration, and, as the presiding justice clearly shows, there was no way by which such resentment could be manifested by the jury but by a verdict of guilty, for, manifestly, this was the only course that was open to the jury to demonstrate that they had not been "fixed." It is readily perceivable how jurors, under such circumstances, even if they honestly entertained a reasonable doubt of the guilt of the accused, might, as a protection to their own reputations, thus be led into voting against their honest convictions as to the guilt or innocence of the accused. Certainly the evidence complained of would quite naturally furnish a very strong motive for the return of a verdict of guilty, whether the evidence warranted such a verdict or not, and there is, therefore, no escape from the conclusion reached by the presiding justice that the ruling allowing said evidence was highly prejudicial.

But I cannot agree with the conclusion reached in the main opinion with respect to the instruction therein declared to be prejudicially erroneous. A careful analysis of said instruction and a consideration of it in connection with the entire charge of the court will, in my opinion, compel the conclusion that it could not have damaged the defendant in the slightest degree. In other words, I do not think that the instruction could have had the effect of influencing the jury against the defendant or of contravening any of his substantial rights, and I am, therefore, of the opinion, that but for the error involved in the ruling of the court admitting O'Neil's alleged declaration with regard to the attitude of the jury toward the defendant, the judgment and order could be consistently upheld.

The instruction complained of is set out in full in the main opinion, and the part thereof which it is claimed told the jury in effect that the defendant's innocence must be proved beyond a reasonable doubt reads as follows: "If, however, after a full and careful deliberation of all the evidence in the case, any one or more of you shall be of the opinion that the defendant has been proved to be guilty of the crime charged, to a moral certainty and beyond a reasonable doubt, those of you entertaining that opinion should vote in favor of guilty, and *should adhere to your opinion until you are convinced beyond a reasonable doubt that you are wrong.*" (Italics mine.)

Very clearly the italicized portion of the foregoing instruction should not have been given to the jury. If this language carried with it any meaning at all, it was plainly erroneous; but in view of the verdict, and considered in connection with the language immediately preceding it and with other instructions on the doctrine of reasonable doubt, the language criticised seems to me to be perfectly meaningless and, therefore, as having conveyed nothing to the jury that could have militated against the substantial rights of the defendant. The proof required to justify the conviction of one charged with a crime must be such as to convince the jurors of his guilt beyond a reasonable doubt, and, of course, it will not be questioned that where one or more of the jurors are so convinced by the evidence, it is their duty to adhere to that conclusion. It is difficult to imagine a case where a juror has been convinced from a consideration of all the evidence beyond a reasonable doubt of the guilt of the accused that such juror could have any occasion to change his mind or the conclusion at which he has arrived. When he has reached that state of mind as to the evidence, he has, so far as he is concerned as a component part of the jury, reached a verdict, and where all the jurors have reached the same verdict, there is nothing remaining to be done but to return such verdict to the court. Obviously, when the jurors have properly reached a verdict of guilty in a criminal case, they are then not concerned about how they may change their minds and arrive at an opposite conclusion, for, having found in the record the *quantum* of proof essential to a conviction, there would be neither necessity nor authority for trying to undo

what they had already found that they were justified by the evidence in doing.

The fallacy of the position that the effect of the instruction or the part thereof animadverted upon was to prejudice the rights of the defendant lies in the assumption that a juror who has been convinced by the evidence beyond a reasonable doubt of the guilt of the defendant might not adhere to that conviction so long as other members of the jury have not reached the same state of mind with regard to the case. No such assumption is, in my opinion, allowable. It is, of course, the duty of the jury to deliberate upon their verdict—that is, to give the evidence full and fair consideration—and it is certainly no less the presumption that one juror, having reached the conclusion that the defendant is guilty under the evidence, has been thus persuaded only after proper deliberation upon his verdict than it is where all the jurors have arrived at a like conclusion. To assume that a juror is likely to be influenced by the attitude or arguments of his confreres is to assume that he has not been satisfied beyond a reasonable doubt of the guilt of the accused, and in that case the erroneous instruction would not apply to him. If a juror wavers in reaching a verdict, it is quite apparent that he has some doubt as to what his verdict should be, and clearly he has not then arrived at that state of mind with reference to the case which would make the instruction applicable to him, and he then would or could not be concerned about it. But, as stated, there is no rule or principle or reason authorizing the assumption that a juror, having been satisfied by the evidence beyond a reasonable doubt of the guilt of the accused, will change his mind merely because his colleagues have been unable to come to the same conclusion, or because the other jurors may by argument or otherwise try to convince him that he is wrong. The presumption is, as stated, that he has formed his conclusion after due deliberation, and, having done so, it is not clear why it is not his duty to stick to such conclusion. And, having been satisfied beyond a reasonable doubt of the defendant's guilt, it is not reasonable to suppose that he would in the least be influenced by any declaration of the court, whether it involved a correct or incorrect statement of the law, as to the conditions on which he might disrobe his mind of the conviction that the accused has been

proved to be guilty by the evidence beyond a reasonable doubt. The jury were repeatedly told by the court that they were not authorized to find the defendant guilty unless the evidence so convinced them beyond a reasonable doubt. They were so told in the first part of the very instruction complained of here, and it must be assumed that they acted on that rule in reaching their verdict. Having thus arrived at a verdict, what possible effect could the criticised language of the instruction have on them one way or the other? The very moment they reached a verdict of guilty the language complained of became meaningless and absolutely without force. There was then no necessity for them to examine or consider or pay any attention to that part of the instruction. This would have been true if the criticised part of the instruction had been couched in proper language, for the verdict represented the crystallization of the final conclusion they had reached under the instructions that, to arrive at a verdict of guilty, they must necessarily be convinced thereof beyond a reasonable doubt.

Of course, if the instruction had said in so many words that the defendant must prove his innocence by evidence satisfying the jury beyond a reasonable doubt, a very much different question would, obviously, be submitted here. But the criticised language can only be made to have that effect by construction, and then, as I have tried to show, it was to take effect or apply only after the jury had by the evidence reached that state of mind with reference to the case which rendered it absolutely necessary for them to return their conclusion in the form of a verdict into court.

My conclusion is, as is manifest, that while, as stated, the instruction is to be condemned, it could not, in my judgment, have operated prejudicially against the defendant.