[Crim. No. 12855. Fourth Dist., Div. Two. May 11, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL EDWARD JORDAN, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Patra Woolum and Suzan E. Hier, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**KAUFMAN, Acting P. J.**—Defendant was charged with numerous felonies, including false imprisonment, kidnaping for robbery, robbery, attempted robbery, and conspiracy arising out of two incidents at Mervyn's De-

partment Store (Mervyn's) in Upland. He was convicted on all counts. Armed and use allegations were found to be true with respect to several of the counts.[1] Defendant was sentenced to state prison, receiving a total determinate term of eight years and eight months, and an indeterminate term of two consecutive life sentences plus three years for enhancements.[2]

---

[1]Defendant was convicted of the following counts:

Count I—Armed robbery—an armed allegation was found to be true.

Count II—Kidnaping of Douglas Miller, for purposes of robbery—armed and use allegations were found to be true.

Count III—False imprisonment of Carolyn Miller—armed and use allegations were found to be true.

Count IV—Kidnaping of Ronald Dimassimo, for purpose of robbery—an armed allegation was found to be true.

Count V—False imprisonment of Nina Dimassimo—an armed allegation was found to be true.

Count VI—Robbery—an armed allegation was found to be true.

Count VII—False imprisonment of Susan Carr—an armed allegation was found to be true.

Count VIII—False imprisonment of JoAnn McDowell—an armed allegation was found to be true.

Count IX—False imprisonment of Veronica Walker—an armed allegation was found to be true.

Count X—Conspiracy—four overt acts were found to be true. There were no armed or use allegations as to the conspiracy count.

[2]Defendant was sentenced as follows:

The trial court selected count VI, the robbery, as the principal term. The court chose the middle base term of three years, plus one year for the armed enhancement, to be consecutive to the base term.

As to count I, attempted robbery, the court imposed an additional determinate sentence of eight months (one-third of the middle base term of two years), plus a one-year armed enhancement. The enhancement was stayed. The sentence on count I was consecutive to those on all the other counts.

As to count III, false imprisonment, the court imposed a sentence of eight months (one-third of the middle base term), plus an additional eight months for the use enhancement (one-third of the enhancement for a defined violent felony) consecutive to all other counts.

As to count V, false imprisonment, the court imposed an eight-month sentence (one-third of the middle base term). A one-year armed enhancement was stayed. The sentence on count V was consecutive to those on all other counts.

As to count VII, false imprisonment, the court imposed an eight-month sentence (one-third of the middle base term). A one-year armed enhancement was stayed. The sentence on count VII was consecutive to those on all other counts.

As to count VIII, false imprisonment, the court imposed an eight-month sentence (one-third of the middle base term). A one-year armed enhancement was stayed. The sentence on count VIII was consecutive to those on all other counts.

As to count IX, false imprisonment, the court imposed an eight-month sentence (one-third of the middle base term). A one-year armed enhancement was stayed. The sentence on count IX was consecutive to those on all other counts.

As to count X, conspiracy, the court sentenced defendant for the middle term of three years, but suspended the sentence until completion of all the other sentences in the case, at which time the suspension would be permanent.

As to count II, kidnaping for purposes of robbery, the court sentenced defendant to an indeterminate term of life in prison with possibility of parole, plus a two-year use enhancement.

As to count IV, kidnaping for purposes of robbery, the court imposed an indeterminate

Defendant appeals, advancing numerous contentions relating to the propriety of a search warrant, the validity of certain charging allegations and the sentence imposed.

## FACTS

*Prosecution's Case*

On April 22, 1980, at 10 p.m., James Knuttel, a Mervyn's employee, was standing by the entrance of the Upland store. It was closing time, and he was assigned to be sure other employees reached their cars safely.

Defendant and another man approached. Defendant showed a Mervyn's badge, stated he was an employee at the West Covina store, and said he was there to pick up a package. Knuttel allowed defendant and the other man to enter the store. In fact, defendant was not a Mervyn's employee.

A short time later, another man, Brian Moore, approached Knuttel. Moore pulled a gun and ordered Knuttel back into the store. Knuttel went inside and walked toward the office, but at some point the gunman disappeared. Knuttel notified the night manager, Douglas Miller, who called the police.

Defendant, who was still in the store, suggested that he and Knuttel go outside to search for the gunman. They found no one.

The police arrived and interviewed Knuttel, Miller and defendant. Defendant again gave the story he was an employee of the West Covina store and was there to pick up a package. He also stated he saw someone, presumably Moore, climb over the back wall. After the police interview, defendant left the store.

---

term of life in prison with possibility of parole, plus a one-year armed enhancement. The sentence on count IV was made consecutive to that on count II, and both indeterminate sentences were made consecutive to all the determinate sentences.

The total determinate sentence was:

| | |
|---|---|
| Count VI | 3 years |
| | +1 year (enhancement) |
| Count I | 8 months |
| Count III | 8 months |
| | +8 months (enhancement) |
| Count V | 8 months |
| Count VII | 8 months |
| Count VIII | 8 months |
| Count IX | 8 months |
| | 104 months = 8 years, 8 months |

The total indeterminate sentence was:

| | |
|---|---|
| Count II | life + 2 years |
| Count IV | life + 1 year |
| | 2 life terms + 3 years |

Ralph Gonzales testified that three days later, at about 7 p.m. on April 25, he met with Frank Vego and defendant. The three went to Ontario in defendant's car. According to Gonzales, defendant told the others they were going to rob Mervyn's, but first they were going to Douglas Miller's house. Defendant told Gonzales and Vego he had learned three days earlier Miller's home address and that Miller was the night manager of the store.

On the way to Miller's house the three men bought a pizza. They ate the pizza but kept the empty box. When they arrived at Miller's house, Gonzales and Vego went up to the door carrying the pizza box. Miller answered the door and said he had not ordered a pizza. Gonzales and Vego, who were armed with a sawed-off shotgun and a .45-caliber automatic pistol, forced their way in. Vego handcuffed Miller with handcuffs supplied by defendant. Defendant then entered wearing a ski mask that covered his face.

Defendant decided everyone would remain in the house until morning, at which time they would enter the Mervyn's Upland store. Mr. Miller told defendant he did not have the combination to the Mervyn's safe, but that Ron Dimassimo, the other manager, did.

About 5:30 the next morning, April 26, Gonzales and Vego left with Miller in Miller's car. Defendant remained with Mrs. Miller and the Millers' baby at the house. Defendant stated Mrs. Miller would be held as security; if everything went right she would not be harmed.

Miller, Gonzales and Vego went to the Dimassimo residence. When Dimassimo answered the door, Miller said he needed to get into the store. Gonzales and Vego, guns drawn, entered Dimassimo's house. They tied and handcuffed Mrs. Dimassimo. They also told Dimassimo that Miller's wife and child were being held, and that if anything went wrong, something would happen to them.

The four men proceeded to Mervyn's. Three cleaning women in the store were tied up. Dimassimo opened the safe and Vego took money, while Gonzales took jewelry from the jewelry counter.

In the meantime, Mrs. Dimassimo had freed herself and called police. Defendant called the store and told Vego and Gonzales the store was surrounded. Gonzales and Vego left their weapons and escaped through the roof hatch.

That evening, defendant picked up Gonzales and Vego and drove to defendant's house in Montebello. When defendant arrived at his house, police were waiting. The officers yelled, "Police, freeze," but defendant imme-

diately accelerated backwards, striking an officer and another car. Defendant, Gonzales and Vego were placed under arrest.

Defendant's house and car were searched pursuant to a search warrant. Police found a hacksaw, shotgun barrel, wooden gun stock, handcuff keys, and other items in defendant's house. A gun clip and a magazine of .45-caliber automatic bullets were found in defendant's car.

Both the sawed-off shotgun and the .45-caliber automatic were found at Mervyn's. The gun barrel and gun stock were probably from the sawed-off shotgun, and the .45-caliber bullets matched the automatic weapon used by Gonzales and Vego.

*Defendant's Case*

Defendant's story at trial was that he and Ron Vego, Frank Vego's brother, went to Mervyn's on April 22 to shoplift.

Defendant testified that he knew Brian Moore, but had nothing to do with Moore's appearance at Mervyn's with the gun; that he did go with Vego to Gonzales' house on April 25, but left at 6:45 p.m.; and that he spent the evening with a friend, Mary Blackwell. Mary Blackwell was dead by the time of trial.

Defendant testified Gonzales was angry at him because defendant and Moore had interfered with a cocaine deal of Gonzales'.

Jerry Lira testified that, while he was in juvenile hall with Gonzales, Gonzales said he would put the kidnaping/robbery off on defendant.

Brian Moore testified that Gonzales owed him $2,800 for cocaine. He asked defendant to help him get the money. When they couldn't find Gonzales, they "ripped off" Gonzales' connection, which angered Gonzales.

## DISCUSSION

### 1. *Consideration of Attachments to the Warrant Affidavit*

■ Defendant first contends the affidavit for the search warrant was fatally defective because the affiant officer failed to fill in a space left blank for specification of the numbers of the attachments appended to the affidavit.[3]

---

[3]The warrant affidavit stated: "The following attachments are incorporated by reference as though set forth herein *haec verba*: [¶] Probable cause for search (see Attachment(s) No(s). _____)" No attachments were listed, and the affidavit otherwise contained no information to establish probable cause.

While the practice of making affidavits by means of attachments, and the attempt to routinize the affidavit form by "reduc[ing] this crucial document to an omnibus form to be executed by filling in blanks and checking boxes" has been criticized (*People* v. *Murgia* (1974) 43 Cal.App.3d 85, 86 [117 Cal.Rptr. 564]), defendant's argument unduly places form over substance.

Except for the attachments the affidavit consisted of three pages containing no substantive averments and there was nothing other than the attachments to supply probable cause. It cannot be assumed the magistrate issued the warrant with no basis whatever. "[A]bsent some palpable indication to the contrary, it is assumed the magistrate considered all the material presented him in support of an application for search warrant. [Citation.] This assumption is not indulged where substantial irregularity appears on the face of the record . . . ." (*People* v. *Kashani* (1983) 143 Cal.App.3d 77, 79-80 [191 Cal.Rptr. 562].)

The failure to fill in the blank referring to the attachments, although careless, is not a "substantial irregularity" so as to call the warrant into question. (See *Kaylor* v. *Superior Court* (1980) 108 Cal.App.3d 451 [166 Cal.Rptr. 598], cited in *Kashani, supra,* in which a number of the attachments were illegible and in which the magistrate expressly testified he did not consider all the attachments but could not remember which ones he had considered.)

The magistrate could and presumably did properly consider all the attachments.

### 2. *Use of a Certified Copy of the Warrant*

■ Defendant argues Penal Code section 1541 requires that only the original arrest warrant and affidavit be used in a 1538.5 hearing. Not so. The warrant, application, affidavit and return are documents of a public entity within the meaning of Evidence Code section 1506. A certified copy of such documents is proper to show the content of the warrant affidavit and attachments. (See *Hewitt* v. *Superior Court* (1970) 5 Cal.App.3d 923, 929-930 [85 Cal.Rptr. 493].)

### 3. *Separate Signature Page*

■ Defendant points out the attachments contain a separate signature page signed by all officers supplying supporting affidavits and by the magistrate. Defendant argues it is not possible to tell what attachments were intended to be affected by the signatures, and that therefore it is impossible to know what the magistrate considered in issuing the warrant.

Absent some demonstrable irregularity, which defendant has failed to show, the assumption is that all the attachments were included and considered. (Cf. *People* v. *Kashani, supra,* 143 Cal.App.3d 77, 79-81.)

4. *Time the Warrant Was Signed*

■ The signature page, signed by four officers and the magistrate, was marked with the time 9:09 a.m., four minutes after the search warrant was signed by the magistrate. Defendant argues the magistrate must therefore have improperly issued the warrant before reviewing the affidavit and attachments.

Defendant is mistaken. *People* v. *Murgia, supra,* 43 Cal.App.3d 85, is not in point. In that case, the magistrate *issued* the warrant one day before the affiant officer executed his supporting affidavit. The court there condemned practices which are open to the dangers of presigned warrants or the alteration of affidavits after issuance of the warrant. There is no such danger in the instant case. In fact, the four-minute time difference supports the view the magistrate reviewed the affidavit materials before the warrant was actually *issued.* (N.B. The time of *issuance* of a warrant to a peace officer is after the time of its *signature* by the magistrate, see Pen. Code, § 1528.)

5. *Reasonableness of the Conclusion Defendant Was Not an Employee of Mervyn's*

Defendant's argument that Officer McCarthy used unreliable information from an unreliable informant to determine defendant was not an employee of Mervyn's is without merit.

■ A citizen informant, especially one who is a victim of crime, is a reliable informant even though his reliability has not been previously proven or tested. (*People* v. *Duren* (1973) 9 Cal.3d 218, 240 [107 Cal.Rptr. 157, 507 P.2d 1365], citing *People* v. *Gardner* (1967) 252 Cal.App.2d 320, 324-325 [60 Cal.Rptr. 321].) Murphy Middleton, the loss prevention (i.e., security) officer of the Upland Mervyn's store, was just such a victim witness. He was employed by Mervyn's precisely to prevent, detect and investigate criminal incidents at his store such as those that happened here. It is a reasonable inference that such a security officer would have access to employee personnel records, including the names of Mervyn's employees.

The fact that Middleton received his information that defendant was not an employee of Mervyn's in West Covina from the West Covina security officer changes nothing. Just as police officers may use reliable information

passed on through official channels (*People* v. *Hogan* (1969) 71 Cal.2d 888, 891 [80 Cal.Rptr. 28, 457 P.2d 868]); information transmitted through the internal channels of the corporation from one security officer to another does not by that fact lose its reliability.

The West Covina loss prevention officer, like Middleton in Upland, was an officer of the victim, and a person in a position to know the information requested.

The information that defendant was not a Mervyn's employee was reliable, and the affiant police officer and the magistrate could properly rely on it.

## 6. *Probable Cause for the Search*

■ Search warrant affidavits should be viewed and construed as a whole in a common sense manner. (*People* v. *Superior Court* (*Johnson*) (1972) 6 Cal.3d 704, 711 [100 Cal.Rptr. 319, 493 P.2d 1183].) Because of the preference accorded to warrants, doubtful or marginal cases will be resolved to uphold the warrant. (*People* v. *Mesa* (1975) 14 Cal.3d 466, 469 [121 Cal.Rptr. 473, 535 P.2d 337].)

■ At the time the officers applied for a warrant to search defendant's house and automobile, they presented the following facts: (1) Defendant entered the Mervyn's Upland store on April 22, stating he was an employee of the West Covina store there to pick up a package; (2) a gunman entered the store a short time later on April 22; (3) store employees, directed by defendant, looked for the gunman, but the gunman successfully escaped; (4) defendant was interviewed about the April 22 incident, along with the night manager and others, and, thus, had the opportunity to find out the night manager's name and address during the police investigation of the gun incident; (5) defendant represented to police during the investigation he was an employee of the West Covina store; (6) defendant was not a Mervyn's employee according to Upland and West Covina personnel records; (7) April 26, four days later, two white men and a man with a ski mask kidnaped the Mervyn's night manager; (8) the two white men took Miller, the night manager, and Dimassimo, to the same Upland Mervyn's store in an attempt to steal money and jewelry; (9) witnesses were able to create composite drawings of the two white men; (10) defendant, a black man, drove up in his driveway with two white men who looked like the Mervyn's kidnapers/robbers; and (11) when police identified themselves, defendant attempted to flee.

### 7. *Impoundment of Defendant's Automobile*

■ Defendant argues there was no evidence to justify a belief he was involved in any illegal activity at Mervyn's; he committed at most a traffic offense in striking another car and there was therefore no cause to take his car into custody. Not so.

The police knew defendant was present at Mervyn's during the incidents of April 22, and they had ample cause to believe he was connected with the robbery attempt of April 26 when he arrived in his car in the company of the two suspects in that incident. Defendant did not merely commit a traffic offense—he actively attempted to flee from apprehension for other reasons. *People* v. *Nagel* (1971) 17 Cal.App.3d 492 [95 Cal.Rptr. 129] and *Virgil* v. *Superior Court* (1968) 268 Cal.App.2d 127 [73 Cal.Rptr. 793] are clearly distinguishable.

This case comes within the rule of *Chambers* v. *Maroney* (1971) 399 U.S. 42, 51 [26 L.Ed.2d 419, 90 S.Ct. 1975]. "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." (*Id.*, at p. 52 26 L.Ed.2d at p. 428].) The officers here chose the first course. They had probable cause to arrest defendant and the other occupants of the car, defendant tried to flee in the car, and struck an officer and a parked car in the attempt. There were sufficient exigent circumstances to warrant taking custody of the automobile. (*Chambers, supra; Carroll* v. *United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280].)[4]

### 8. *Filing of Count I*

Count I of the complaint charged defendant, along with the gunman of April 22, with attempted robbery of James Knuttel, the employee who permitted defendant to enter the store and who was a short time later confronted by the gunman.

The magistrate declined to hold defendant to answer on count I, because he found insufficient evidence of any purpose to rob Knuttel.

---

[4]This case may be distinguished from *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 64, 91 S.Ct. 2022] in which the later search warrant was constitutionally defective and the search of the automobile could be justified only on some other basis. The warrant obtained here fully satisfies constitutional requirements. Nor is this a case, like *People* v. *Shuey* (1975) 13 Cal.3d 835 [120 Cal.Rptr. 83, 533 P.2d 211], where the police by their very failure to obtain a warrant when there was time to do so "created" the exigency (possible destruction of evidence) which they used to "secure the premises" while the warrant was sought.

Defendant argues count I should not have been refiled in the information.

■ "[T]he rule has developed that an information charging an offense not named in the commitment order will not be upheld unless the evidence taken by the magistrate shows that the offense was committed and that it arose out of the transaction which was the basis for commitment on a related offense." (*Parnell* v. *Superior Court* (1981) 119 Cal.App.3d 392, 404 [173 Cal.Rptr. 906].)

"This rule is subject to the qualification that an offense not named in the commitment order may not be added to the information if the magistrate made *factual findings* which are fatal to the asserted conclusion that the offense was committed. . . . When, however, the magistrate either expressly or impliedly accepts the evidence and simply reaches the ultimate *legal conclusion* that it does not provide probable cause to believe the offense was committed, such conclusion is open to challenge by adding the offense to the information." (*Pizano* v. *Superior Court* (1978) 21 Cal.3d 128, 133 [145 Cal.Rptr. 524, 577 P.2d 659], italics in original.)

Here, the magistrate made no factual findings on the evidence which would preclude a refiling of the charge. The magistrate accepted the evidence with respect to the offense, even stating, "[t]here is . . . a basis in the evidence to believe that presence in the store may have been with the thought in mind of robbing the store." The magistrate simply made the legal conclusion there was no attempt to rob *Knuttel*. The magistrate's conclusion would not prevent a refiling of the charge in count I.

### 9. *The Attempted Robbery and Robbery of "Mervyn's"*

When the charge of attempted robbery in count I was refiled in the information, defendant was accused of the attempted robbery of "Mervyn's." Similarly, the robbery count, count VI, accused defendant of the robbery of "Mervyn's."

■ Defendant argues robbery must involve a taking from the person or immediate presence of someone and "Mervyn's" is not a person.

Defendant did not demur and has therefore waived all but jurisdictional defects in the pleadings. The allegation that "Mervyn's" was the victim of the robbery is not a jurisdictional defect. Mervyn's is a corporation, and obviously cannot act except through its officers and employees. An accusation of the robbery or attempted robbery of "Mervyn's" necessarily implies that the taking by force or fear be from the presence or possession of some officer or employee of Mervyn's.

*In re Duel* (1931) 112 Cal.App. 24 [296 P. 91], is instructive. In that case it was alleged the defendants stole property from Arthur Scovil, a clerk for the Carley Hamilton Company, a corporation. A demurrer to the information was sustained with leave to amend. Then an amended information was filed, "charging that the property was taken, stolen and carried away 'against the will and without the consent of the said Arthur Scovil *and of said Carley Hamilton Company*' . . . . [¶] It is contended that the inclusion of the italicized clause added a new element to the charge which finds no support in the testimony adduced at the preliminary examination, and that consequently the defendants stand charged with an offense for which they were not committed by a magistrate. [¶] The point is without merit for the reason that the amendment was wholly unnecessary. . . . And with respect to the ownership of the property *it has been repeatedly held that when the property is taken out of the possession of a bailee or agent of the owner it may be described in the pleading as the property of either bailor or bailee, or owner or agent* (22 Cal.Jur. 848, 849; *People* v. *Dean,* 66 Cal.App. 602 [226 Pac. 943]). 'The actual status of the legal title to the stolen property is of no concern to the thief' and consequently one who has the right of possession as against the thief is, so far as the latter is concerned, the owner [citation]." (112 Cal.App. at p. 25, italics added.)

 Conversely, where the evidence at the preliminary hearing plainly discloses the officers or employees of the corporation who were the actual victims, the defendant is put on sufficient notice of the charge against him by the accusation of robbery or attempted robbery of the store or corporation. "An information is sufficient if it contains in substance a statement that the accused has committed some public offense therein specified. 'It may be . . . in any words sufficient to give the accused notice of the offense of which he is accused.' " (*People* v. *Blankenship* (1951) 103 Cal.App.2d 60, 62 [228 P.2d 835].) "The decisive question in the present case is whether the variance was of such a substantial character as to have misled defendants in preparing their defense. There is no indication whatever that defendants were prejudiced in that respect." (*People* v. *Collins* (1960) 54 Cal.2d 57, 60 [4 Cal.Rptr. 158, 351 P.2d 326].)

The original charge in count I accused defendant of the attempted robbery of James Knuttel, the Mervyn's employee overseeing the people going in and out of the door near closing time on April 22. If the evidence at the preliminary hearing was consistent with defendant's intent to participate in a robbery, as the magistrate expressly indicated it was, it supported the charge of attempted robbery of Knuttel and defendant should have been bound over on that charge. Although nothing belonging to Knuttel personally was attempted to be taken, Knuttel was a victim of the attempted robbery of "Mervyn's." He was an employee of Mervyn's; it was his duty to

supervise the access into and out of the store at that time; it was Knuttel against whom the "force or fear" was directed; he had, in effect, constructive custody of the store's property, and he was in a position of supervising its security.

With respect to count VI, the robbery, the evidence at the preliminary hearing showed that defendant's partners in crime attempted to take the property from the presence of Miller, Dimassimo and the cleaning staff. As against the right of the defendants to the property, the store managers and cleaning persons had custody of the store's property. (*People* v. *Downs* (1952) 114 Cal.App.2d 758 [251 P.2d 369] [two custodians were in "possession" of money taken from the company safe for purposes of the robbery statute]; see also *People* v. *Moore* (1970) 4 Cal.App.3d 668 [84 Cal.Rptr. 771].)

10. *Sentencing*

A. *Use Enhancement on False Imprisonment Count*

Defendant correctly contends and the Attorney General concedes this case is governed by the rule in *People* v. *Harvey* (1979) 25 Cal.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396]. Although the rule in *Harvey* has been altered by statute, the remedial legislation became effective after the instant offenses were committed. False imprisonment cannot, under the *Harvey* rule, be the basis of a use enhancement. The use enhancement on the false imprisonment count is therefore erroneous and must be stricken.

B. *Sentencing for Both Robbery and Kidnaping for Robbery*

Defendant argues and the Attorney General concedes defendant cannot be punished for both robbery and kidnaping for the purpose of robbery with respect to the offenses of April 26 because the purpose and the victims of the robbery and the kidnapings were the same. The sentence on the robbery count must be stayed. (See *People* v. *Milan* (1973) 9 Cal.3d 185, 197 [107 Cal.Rptr. 68, 507 P.2d 956].)

C. *Multiple Use and Armed Enhancements*

Defendant asserts he may not be sentenced for more than one armed or use enhancement for the April 26 incident.

The jury found defendant personally used a firearm with respect to count II (kidnaping of Douglas Miller) and count III (false imprisonment of Car-

olyn Miller). We have already held the use enhancement as to count III must be stricken, so that dual enhancement problem has disappeared.

The jury found defendant was armed with a deadly weapon with respect to count I (attempted robbery on Apr. 22, 1980), count IV (kidnaping of Ronald Dimassimo), count V (false imprisonment of Nina Dimassimo), count VI (robbery), count VII (false imprisonment of Susan Carr), count VIII (false imprisonment of JoAnn McDowell), and count IX (false imprisonment of Veronica Walker).

Defendant relies on the statement of the general rule, "[I]f all the charged offenses are incident to one objective and effectively comprise an indivisible transaction, then section 12022.5 may be invoked only once and not in accordance with the number of victims." (*In re Culbreth* (1976) 17 Cal.3d 330, 333-334 [130 Cal.Rptr. 719, 551 P.2d 23].)[5]

Defendant has failed to analyze the reason for the rule stated in *Culbreth.* The court there criticized the imposition of multiple enhancements where there were multiple victims, but only a single occasion of gun use. The California Supreme Court stated: " '. . . A special deterrence against firearm use is [the] objective [of section 12022.5]. The legislative theory is deterrence, whose power augments with each successive occasion. If the threat of [an enhancement] has failed to deter the first occasion of gun use, a second occasion may be deterred by doubling the threat, a third by tripling it. Thus the statute envisions a single application of deterrent force for each occasion, hopefully to deter gun use on a future occasion. ▮ Where . . . a single judgment imposes sentences for several crimes committed upon a single occasion, only one finding under section 12022.5 is permissible.' [¶] . . . 'The prohibition against multiple findings of use of a firearm applies where there is a "use" in the commission of a crime against multiple victims.' . . . 'It is the law that with respect to one "occasion" only one finding under section 12022.5 is permissible, regardless of the number of victims.' " (*Culbreth, supra,* at p. 334.)

The *Culbreth* court expressly stated, however, "[t]he legislative purpose of section 12022.5 has been described as deterrence, i.e., to deter the use of firearms on subsequent occasions. Thus it has been held that where there are consecutive robberies in several communities over a period of several hours, a defendant may not bootstrap himself into avoidance of additional penalties by claiming that the series of divisible acts, each of which had been committed with a separate identifiable intent and objective, composed

---

[5]A similar rule has been applied to armed enhancements (Pen. Code, § 12022). (*People v. Freeman* (1979) 95 Cal.App.3d 917, 924-925 [157 Cal.Rptr. 454].)

an indivisible transaction. (*People* v. *Massie* (1967) 66 Cal.2d 899, 908 [59 Cal.Rptr. 733, 428 P.2d 869]; *People* v. *Whittaker* (1974) 41 Cal.App.3d 303, 310 [115 Cal.Rptr. 845].)" (*Culbreth, supra,* at p. 333.)

 For purposes of fulfilling the legislative objective of deterrence, the Attorney General argues the kidnaping of Ronald Dimassimo is divisible from the other offenses of April 26. We agree.

Douglas Miller, Carolyn Miller and the three cleaning persons on the premises at Mervyn's were multiple victims of what was in essence a single "occasion" of gun use. All these persons were forseeable victims of the gun use in the contemplation of the defendants pursuant to the single objective of robbing the Mervyn's Upland store. The kidnaping of Ronald Dimassimo and the false imprisonment of his wife, however, represent a divisible "occasion" of gun use. The kidnaping of Dimassimo was not within the objectives of the original enterprise. Defendants, after ample time for deliberate consideration, formed the separate intent to kidnap Dimassimo. They waited several hours and intentionally traveled, not directly to Mervyn's, but to Dimassimo's house to carry out the subsequently formed objective to kidnap Dimassimo. This was not an occasion, as in *Culbreth,* of a "single frenetic act of violence," or one in which, as in *People* v. *Edwards* (1981) 117 Cal.App.3d 436 [172 Cal.Rptr. 652], the multiple victims were all in the same place at the same time on the occasion of "use" of a firearm. There was both time and distance between defendants and the new objective to kidnap Dimassimo in which the deterrent threat of an additional enhancement had an opportunity to have psychological effect.[6]

Defendant may not, simply because the kidnaping was also related to the ultimate goal of robbing Mervyn's, bootstrap himself into avoidance of additional penalties for this separately formed intent to employ a gun. Defendant may properly suffer a use enhancement for the offenses of April 26, an additional armed enhancement for the separate kidnaping of Ronald Di-

---

[6]See also *People* v. *Beamon* (1973) 8 Cal.3d 625, 639, footnotes 11 and 12 [105 Cal.Rptr. 681, 504 P.2d 905]. Footnote 11 states: "It seems clear that a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]" For example, the defendant in that case could not be punished for both robbery and kidnaping for the purpose of robbery, but defendant might also have been charged with attempted murder or assault with intent to commit murder based on his telling an accomplice to kill the victim. As the court stated in footnote 12: "If defendant had been convicted of either of such charges, he could arguably have been separately punished therefor on the theory that the belated attack on Ashcraft [the victim] was not part of defendant's original objective but was subsequently conceived in response to an unexpected event occurring during commission of the underlying crime. [Citations.]" Similarly, in the instant case, defendants conceived of the second kidnaping only in response to an unexpected turn of events, and it was not a part of their original objective.

massimo, and an armed enhancement with respect to the attempted robbery of April 22.

## DISPOSITION

The judgment is affirmed as to all counts. The trial court erred, however, in certain matters of sentencing. The sentence on count VI, robbery, must be stayed, and the use enhancement as to count III, false imprisonment, must be stricken. Other matters, e.g., the selection of the principal term, the imposition of enhancements, or consecutive or concurrent terms, and the fixing of the maximum determinate term under section 1170.1, subdivision (g), are matters to be determined by the trial court on remand. The cause is remanded for resentencing in accordance with law and consistent with this opinion.

McDaniel, J., and Rickles, J., concurred.