[Crim. No. 27565. Second Dist., Div. Five. Mar. 4, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
CARL FRANKLIN, Defendant and Appellant.

## COUNSEL

Michael Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HASTINGS, J.**—Defendant, Carl Franklin, was accused in counts I and V of robbery (Pen. Code, § 211); in count II of kidnaping (Pen. Code, § 207); in count III of rape (Pen. Code, § 261, subd. 2); in count IV of attempted robbery (Pen. Code, §§ 211, 664); in count VI of assault with a deadly weapon (Pen. Code, § 245, subd. (a)); in count VII of unlawful

sexual intercourse (Pen. Code, § 261.5); and in count VIII of rape (Pen. Code, § 261, subd. 3.) It was also alleged that at the time of the commission of the offenses described in counts I, III, IV, VII, and VIII, defendant was armed with a deadly weapon, to-wit, a butcher knife. Defendant pleaded not guilty, and waived his right to a jury trial. However, on the day of the trial, after the first witness was sworn, defendant withdrew his original waiver, and requested a jury trial. Pursuant to stipulation, the court declared a mistrial, and upon motions by the People and the defendant, counts VII and III, respectively, were dismissed. In a trial by jury, defendant was found guilty of robbery of the first degree (count I); robbery of the second degree (count V); and rape (count VIII); as to counts I and VIII, the jury further found that defendant was armed in the commission of these offenses. The jury found defendant not guilty of attempted robbery (count IV), and was unable to reach a verdict on counts II (kidnaping) and VI (assault with a deadly weapon); a mistrial was declared as to these latter two counts. Defendant's motion for a new trial was denied, and as to each count he was sentenced to the state prison for the term prescribed by law, less 424 days' credit for time already served; the sentences on counts I and V were ordered to be served concurrently with each other, and the sentence on count VIII was ordered to be served consecutively with that on counts I and V.

Defendant appeals from the judgment of conviction contending (1) that he was twice put in jeopardy; (2) that the trial judge committed prejudicial misconduct; (3) that the court erred in not disqualifying a juror; (4) that he was denied adequate representation by counsel at trial; and (5) that the court erred in its ruling on the requisite intent needed for the crime of rape.

In the early morning hours of June 20, 1971, William Patmon, after making a purchase at a liquor store, entered his car which was parked on Slauson near Seventh Avenue. As he sat in the driver's seat defendant arose from the back seat and placed a knife against Patmon's neck. Defendant told Patmon to give him all of his money and then to drive defendant west on Slauson through the Crenshaw area. After having passed Crenshaw Boulevard, defendant ordered Patmon to pull into the parking lot of a hamburger stand, where defendant proceeded to search Patmon's pockets and boots for additional money. Patmon was then told to continue driving west on Slauson. As the car approached West Boulevard, Patmon was directed by defendant to turn south on West Boulevard and pull into a parking lot. Defendant told Patmon to give

him the car keys. Defendant then exited the vehicle and approached two young girls, Chrystal T. and Marilyn H., who had been observed by Patmon to be walking down West Boulevard. Defendant put his arm around Chrystal and pressed the knife against her neck. He asked them if they had any money, and after receiving a negative reply, instructed them to walk across the street acting as if they knew him. Patmon withdrew from the scene at this time seeking a patrolman. Upon reaching the courtyard of some apartments, defendant told Marilyn to stand on some steps, while he pushed Chrystal to the ground. While holding the knife in his hand, defendant proceeded to have sexual intercourse with Chrystal, telling Marilyn that he would kill Chrystal if Marilyn moved. A police officer arrived at this time, having been alerted by Patmon. Defendant was ordered to "Halt," but proceeded to run toward the rear of the apartments and escaped capture. Chrystal was crying, and the officer observed a wad of currency, car keys, and a butcher knife lying on the ground. The car keys were subsequently identified as those taken from Patmon.

Sometime around 2:15 a.m. the same evening, Beatrice Johnson returned to her home after finishing work. Having opened her front door with her key and stepping inside, she was prevented from closing the door behind her by defendant who was standing on her porch. Defendant knocked her to the ground and took her purse from her shoulder. Her screams alerted a neighbor who began shooting at defendant with his gun; however, he again escaped capture. In response to a robbery call regarding the Johnson incident, police officers began searching the area. Defendant was observed running down an alley, and upon pursuit he was found lying behind some bushes. Johnson's purse was found with defendant.

Testifying in defendant's behalf, Patricia Johnson stated that she had been married on the afternoon of June 19, 1971, and that defendant had been an usher at the ceremony. She also testified that defendant was present at an early reception, where he was observed to be drinking beer and champagne, and that he appeared to be under the influence of alcohol. Defendant also was said to have been present at a second reception party, where he was seen smoking marijuana, possessing "reds" (seconal pills), and observed to be staggering.

Dr. Alvin E. Davis testified that he was a psychiatrist appointed by the court to examine defendant, and submitted a psychiatric report. During his interview with Dr. Davis, defendant was said to have told the

psychiatrist that at the wedding receptions he drank two-fifths of wine, one-half pint of whiskey, and took three seconal capsules. Defendant was said to have also believed that there had been LSD in some food or beverage "at the party," and it also was related to Dr. Davis that defendant had a history of suspected epilepsy and had had a series of blackouts at the age of 15 or 16. Dr. David testified that, in his opinion, defendant could not have ingested such large amounts of alcohol and seconal without becoming comatose, but that if defendant had taken lesser amounts, coupled with the ingestion of LSD, his behavior would be entirely consistent with his psychotic mental state at that time; that a loss of memory would most inevitably result; and that defendant would not have had the mental capacity to form the specific intent to rob.

■ Defendant initially contends that he was put in double jeopardy when the trial by jury commenced after the declaration of the mistrial. While it is accepted that a defendant is put into jeopardy when the trial is "entered upon" and the first witness sworn (*Richard M.* v. *Superior Court,* 4 Cal.3d 370, 376 [93 Cal.Rptr. 752, 482 P.2d 664]), it is well settled that a defendant's consent to a mistrial operates as a waiver of the claim of once in jeopardy. (*Curry* v. *Superior Court,* 2 Cal.3d 707, 713 [87 Cal.Rptr. 361, 470 P.2d 345]; *Cardenas* v. *Superior Court,* 56 Cal.2d 273, 276 [14 Cal.Rptr. 657, 363 P.2d 889, 100 A.L.R.2d 371]; *People* v. *Mills,* 148 Cal.App.2d 392, 394-395 [306 P.2d 1005].) Here, defendant had previously waived his right to a jury trial in open court. Subsequent to the swearing of the first witness in his original court trial, defendant indicated that he wished to withdraw his original waiver and instead be tried by jury. He then personally agreed that the court could declare a mistrial so that he might subsequently receive a jury trial. Pursuant to a stipulation between defendant and all counsel, the court declared a mistrial. The record shows that defendant clearly consented to the mistrial and is thus precluded from making a later claim of double jeopardy.

Defendant's contention fails for yet another reason. It is well established that the failure to interpose a plea of double jeopardy in the trial court waives the defense which cannot be raised for the first time on appeal. (*People* v. *Fairchild,* 254 Cal.App.2d 831, 835 [62 Cal.Rptr. 535]). Defendant entered no such plea at his jury trial, and this court is thus precluded from considering the defense for the first time at this stage.

■ Defendant's second contention is that the trial judge committed a prejudicial act of misconduct by turning his back to the defense witness

during expert testimony. It is urged that such act impressed upon the jury an improper inference that the judicial officer did not believe the witness' testimony.

█ A judge is obligated to conduct the trial in a fair and impartial manner. He must not become an advocate for either party, comment on the evidence, or cast aspersions or ridicule on a witness. (*People* v. *Rigney*, 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186].) █ In the present case, defense counsel's objection to the court's conduct was made out of the presence of the jury. The judge responded by indicating that he had turned his back so as to not unduly influence the jury with any unconscious facial expression that may occur. Upon renewal of the objection during argument for a new trial, the judge additionally indicated that such turning in his chair affords him a more relaxing posture, and he reiterated his prior purpose of guarding unconscious facial overtones. The fact that the court's gesture was of extremely short duration, and that counsel's objection was made out of the presence of the jury, so as not to put them on notice as to defendant's contention, suggests that the conduct could not have amounted to judicial action constituting reversible error.

Even where conduct by a trial judge may approach the boundaries of improper discretion, an admonition to disregard his conduct can be deemed curative, and it must be assumed that the jury was possessed of ordinary intelligence and followed such instructions. (*People* ex rel. *Dept. of Public Works* v. *Lillard,* 219 Cal.App.2d 368, 375-376 [33 Cal.Rptr. 189].) In his final instructions to the jury, the court gave CALJIC No. 17.30,[1] cautioning them not to infer any fact from the conduct of the trial judge. This cautionary instruction given was sufficient to protect the defendant from any prejudice that may have remotely occurred.

█ Defendant also seeks reversal contending that the trial judge erred in not disqualifying a juror. After the jury had begun its deliberations, one juror, Mrs. Allen, caused a note to be sent to the court stating that she wanted "[t]o disqualify myself because of the dope aspect of the case that the defense brought out in his closing statements." It seemed that Mrs. Allen had been drugged at a party, and had "run

---

[1]CALJIC No. 17.30 provides:
"I have not intended by anything I have said or·done, or by any questions that I may have asked, to intimate or suggest what you should find to be the facts·on any questions submitted to you, or that I believe or disbelieve any witness.
"If anything I have done or said has seemed to so indicate, you will disregard it and form your own opinion."

amuck" for three days with apparent lapses of memory during that time; an experience not unlike that related by defense testimony relevant to diminished capacity. She told the court, in chambers, that she felt that she could not separate her personal feelings from the evidence in the case, and would have trouble rendering a true and unbiased verdict. Questioning by the court, the defense, and the prosecution, however, brought out comments by Mrs. Allen expressing that she could shut out of her mind her own personal experiences. The court indicated that it would permit her to continue service if she could decide the case as her conscience told her, based upon the evidence as presented, leaving her personal experience out of her deliberations.

Appellant bases his attack upon Penal Code section 1089,[2] arguing that Mrs. Allen's statements satisfy the good cause standard of the statute, and that under Penal Code section 1120,[3] she possessed "personal knowledge respecting a fact in controversy." There is, of course, nothing in the transcript that shows that Mrs. Allen "knew" anything relevant to the facts of this particular case, but rather, that she had been through a similar experience to that being pursued by the defense.

Section 1089 presents a different problem. A juror's admission that by reason of the nature of the case it would be difficult for him to keep an open mind constitutes a basis for his disqualification before trial, and may amount to good cause upon such an assertion made during trial, provided it actually renders him "unable to perform his duty." (*People* v. *Compton*, 6 Cal.3d 55, 59 [98 Cal.Rptr. 217, 490 P.2d 537].) The trial court's discretion as to the determination of "good cause" under the statute, however, is bridled to the extent that the facts must "show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality." (*Id.*, at p. 60; *People* v.

[2]Penal Code, section 1089 provides in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors."

[3]Penal Code, section 1120 provides:

"If a juror has any personal knowledge respecting a fact in controversy in a cause, he must declare the same in open court during the trial. If, during the retirement of the jury, a juror declare a fact which could be evidence in the cause, as of his own knowledge, the jury must return into court. In either of these cases, the juror making the statement must be sworn as a witness and examined in the presence of the parties in order that the court may determine whether good cause exists for his discharge as a juror."

*Hamilton*, 60 Cal.2d 105, 124-127 [32 Cal.Rptr. 4, 383 P.2d 412].) The court must not presume the worst. (*People* v. *Compton, supra,* at p. 60.)

From the record it appears that Mrs. Allen's comments clearly do not reach the required standard of an inability to perform the functions of a juror. She appeared intelligently sensitive to the effect that her personal experience may have on the case, and indicated her desire to serve and render a fair decision. With such statements on the record, the court's discretion was extremely diminished to justify the disqualification of Mrs. Allen under sections 1089 and 1120. It is also to be noted that the juror herein was, by virtue of her experience, sympathetic to defendant's position during trial. The subsequent return of the unanimous verdict of the robbery counts further indicates that her ability to view the evidence as given by the testimony, without reference to the subjective influence, was not tainted by her previous unfortunate event.

■ Defendant's fourth contention of error represents that he was denied adequate representation of counsel in his jury trial. In order to justify relief on the ground of inadequate representation of counsel, it must appear that counsel's lack of diligence reduced the trial to a "farce or sham." (*People* v. *Stanworth*, 11 Cal.3d 588, 612-613 [114 Cal.Rptr. 250, 522 P.2d 1058]; *People* v. *Ibarra*, 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People* v. *Floyd*, 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64].)

To establish his claim, defendant argues that his defense of diminished capacity could have been proven more effectively by the alleged testimony of defendant's mother, and that of Mr. Theodore Rogers. The record shows that defense counsel planned to call Rogers as a witness in the case, and entertained discussion with the court as to Rogers' disregard for his own counsel's advice not to testify. Rogers, however, was never called to the stand. There is no reference in the record as to the possible testimony of defendant's mother.

The selection of potential witnesses is a legitimate tactical decision for the trial counsel to undertake. (*People* v. *Floyd, supra,* at pp. 709-710.) "In the heat of a trial, defendant's counsel is best able to determine

proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel." (*People* v. *Brooks*, 64 Cal.2d 130, 140 [48 Cal.Rptr. 879, 410 P.2d 383].)

The record discloses that defendant's defense of diminished capacity was brought to the attention of the jury through the testimony of Mrs. Patricia Johnson and Dr. Davis. Moreover, the jury was fully instructed as to this available defense through CALJIC No. 3.35. Defendant has not satisfied the requisite burden to establish inadequate representation at his trial.

Defendant finally contends that the court erred in two instances by its ruling that rape is a general intent crime. The first involved the sustaining of a relevancy objection by the People in connection with Dr. Davis' opinion of whether the defendant could have formed the intent to commit rape. The second concerned the court's final instructions to the jury which characterized rape as a general intent offense.

Defendant's reliance on the decisions in *In re Kemp,* 1 Cal.3d 190 [81 Cal.Rptr. 609, 460 P.2d 481]; *People* v. *Fain,* 70 Cal.2d 588 [75 Cal.Rptr. 633, 451 P.2d 65]; and *People* v. *Tidmore,* 218 Cal.App.2d 716 [32 Cal.Rptr. 444], for the proposition that rape is a specific intent crime, is misplaced. The specific intent referred to in *Kemp* related to that requisite state of mind needed to sustain a conviction for first degree murder where the killing occurred during the commission of a rape. (See *People* v. *Kemp,* 55 Cal.2d 458, 471-472 [11 Cal.Rptr. 361, 359 P.2d 913].) Similarly, *Fain* involved a felony-murder conviction requiring proof that the defendant entertained the specific intent to commit the underlying felony (rape). And *Tidmore* involved a burglary offense where the felony intended to be committed was a rape.

It has been specifically held that rape is a general intent offense. (*People* v. *Butcher,* 174 Cal.App.2d 722, 731 [345 P.2d 127].) While it is true that the requisite mental state to commit rape requires more than just the intent to commit sexual intercourse, the fact that it must be accomplished through the use of force or violence does not elevate the crime to that necessitating proof of a specific intent, as that term of art is understood to require. " 'When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to

be a general criminal intent.' " (*People* v. *Daniels,* 14 Cal.3d 857, 860 [122 Cal.Rptr. 872, 537 P.2d 1232].)

We are satisfied that the court's characterization of the requisite intent needed for rape, and its concomitant rulings, were proper, and that no error was committed.

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.