[Crim. No. 43615. Second Dist., Div. Four. Oct. 25, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
GABRIELLA REBEKKA GOLDBERG, Defendant and Appellant.

172

COUNSEL

Lawrence William Steinberg for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KINGSLEY, J.—Defendant, along with three codefendants,[1] was charged with several crimes in connection with a break-in and theft at the home of a wealthy elderly woman. Upon trial by jury, defendant was found guilty of first degree burglary (Pen. Code, § 459) and conspiracy to commit burglary (Pen. Code, § 182); she was acquitted on a third count, and all remaining counts were dismissed at various stages of the proceedings. She has appealed the two convictions; we affirm.

The victim, Mary O'Hildebrandt, lived alone in a large house. Defendant was her dressmaker, and occasionally visited her to make fittings. On some of these visits, defendant stayed overnight.

One such occasion was the night of the charged crimes, January 5, 1981. After Ms. O'Hildebrandt had asked defendant to lock up the house and both

---

[1]Pretrial proceedings resulted in defendant being tried together with only one of the original codefendants, with a separate jury for each.

had gone to bed, O'Hildebrandt was attacked, blindfolded, and beaten by a masked person. During the next few hours, she heard two or more people moving furniture about the house, and at one point heard a drawer of cutlery crash to the floor and defendant say, "I'm so sorry."

At three o'clock the next morning, police found defendant lying bruised, gagged and loosely hogtied in an adjacent driveway. O'Hildebrandt, found tied in her house, was in far worse physical condition, and required hospitalization. There were no signs of forced entry.

Missing from the house were numerous items of furniture, kitchenware, china, silver and jewelry. Subsequently, some of these items were observed in the home of defendant's daughter (one of the original codefendants), and defendant herself sold others to two dealers in bullion and precious metals. The police obtained a warrant for defendant's arrest, and upon serving it at her home, found some of the stolen items there.

Defendant testified that she was a covictim, rather than perpetrator, of the crimes, and that the items she possessed were either her own or had been given or lent to her by Ms. O'Hildebrandt.

## I

When defendant was arrested and her home searched, the police found her in possession of many of the items stolen from O'Hildebrandt on the night of the crimes. Recognizing that these items were recovered as the fruit of her arrest, defendant challenges the arrest, attacking each link in the chain of probable cause that led to it. She also challenges the scope of the search itself. To deal with these contentions it is necessary to recite the underlying facts in some detail.

A few months after the crimes, Ms. O'Hildebrandt received several phone calls from a Hector Mendez. Mendez told her that he had some of the stolen items, and named defendant and Penny Whitley (defendant's daughter and one of the original codefendants) as the thieves. He offered to return one of the stolen rings in exchange for the $57 necessary to retrieve it from the shop where he had pawned it. He also mentioned that he was broke and needed a job and a place to live; he advised O'Hildebrandt not to contact the police.

O'Hildebrandt agreed to send a friend of hers to meet Mendez for the exchange. However, contrary to Mendez' instructions, she contacted the police, who dispatched an undercover officer to pose as her representative at the meeting. At the prescribed time and place, the officer met with Men-

dez and as soon as Mendez produced the pawn ticket arrested him for extortion and receiving stolen property.

The ring was recovered from pawn, and found to fit the description O'Hildebrandt had given. Upon questioning, Mendez stated that Whitley and her roommate, Roxanne McCawley,[2] had told him that defendant and McCawley perpetrated the crimes, and that his own role was nothing more than an attempt to act as a "good citizen" in accordance with his probation officer's advice.

On June 9, 1981, Police Officer Bernard Melekian prepared *Ramey*[3] arrest-warrant affidavits for defendant, Whitley and McCawley. Each affidavit stated as follows: "Your affiant has obtained information from those who have knowledge of [the January 5 crimes], whose reports are attached here and incorporated by reference. He has reviewed each of these written reports and statements. They were prepared by persons known to your affiant to be law enforcement officers (and others). These reports and statements consist of 12 pages. These reports and statements contain information from victim(s), witnesses, and others concerning the commission of the criminal offense(s) for which a warrant of arrest is being sought. Each of these documents is presently on official-record of a law enforcement agency."

The remainder of each affidavit consisted of 12 pages of unsworn police reports, prepared by Melekian and other named officers. The reports recited the above-described information regarding Mendez, the circumstances of the January 5 crimes and those of a prior burglary that had occurred at O'Hildebrandt's house in October 1980. The reports mentioned defendant's presence at the house during both burglaries, that she had initially been suspected then apparently exonerated of the October burglary, and that the October burglary remained unsolved.

At 5:30 p.m. on June 9, the magistrate who was to be presented with these affidavits examined Mendez under oath. (See Pen. Code, § 1526.) In the examination, Mendez essentially repeated, with elaboration, his involvement as described in the police reports, and he tended on the whole to exonerate himself. He also stated that he obtained O'Hildebrandt's ring from the Whitley-McCawley apartment, and that he helped both women move large amounts of furs and furniture to a storage locker.

The magistrate appended a note to the affidavits, stating that he had examined Mendez and found him to be "reliable." At 10 p.m. he issued arrest

---

[2]McCawley is the codefendant whose case was tried with defendant's, by a separate jury. (See fn. 1, *ante.*)

[3]*People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333].

warrants for Whitley and McCawley. Pending receipt of more information, however, he declined to issue a warrant for defendant's arrest.

The Whitley/McCawley warrants were served at 10:30 p.m. As a result of these arrests, Melekian appended and incorporated a supplemental police report to the affidavit in support of defendant's arrest. According to the supplemental report, various items of O'Hildebrandt's property were found at the Whitley and McCawley homes,[4] still more were found at a storage locker to which Whitley took the police, and Whitley detailed defendant's involvement in the crimes.

Presented with this supplemental affidavit, the magistrate issued a warrant for defendant's arrest at 4:36 a.m. June 10. Upon serving the warrant, police saw, inter alia, O'Hildebrandt's antique chair in defendant's home and recovered more stolen items in a consent search.

(a) Defendant first contends that the arrest of Mendez was illegal and that the fruits of that arrest could therefore not be used in the *Ramey* affidavits. ■ We do not reach the contention that Mendez should have been *Mirandized*[5] before being asked to produce the pawn ticket, since a defendant has no standing to challenge the violation of a third party's *Miranda* rights. (*People* v. *Varnum* (1967) 66 Cal.2d 808 [59 Cal.Rptr. 108, 427 P.2d 772].) ■ We do reach the contention that the police lacked probable cause for the arrest, however, since an arrest is a seizure of the person within the meaning of the Fourth Amendment (*Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]), and evidence obtained in violation of the Fourth Amendment is inadmissible in California "whether or not it was obtained in violation of the particular defendant's constitutional rights." (*People* v. *Martin* (1955) 45 Cal.2d 755, 761 [290 P.2d 855]; see also *People* v. *Hackett* (1981) 115 Cal.App.3d 592, 595 [171 Cal.Rptr. 320].)[6]

It is doubtful whether the police had probable cause to arrest Mendez for attempted extortion. Extortion is the obtaining of property with consent induced by the "wrongful use of force or fear" (Pen. Code, § 578), and there is no indication here that Mendez used force or fear to induce O'Hildebrandt to part with the price of the pawn ticket. Rather, the inducement was O'Hildebrandt's assumed desire to recover her property.

---

[4]Whitley and McCawley were no longer living together at the time of their arrests.

[5]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[6]Since this case arose before the advent of Proposition 8, we are not concerned with the divergence, if any, between California and federal law on this issue. (See *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149].)

However, at the time Mendez met the undercover officer, if not before, there was ample cause "to lead a person of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion" that he was guilty of receiving stolen property. (*People* v. *Lewis* (1980) 109 Cal.App.3d 599, 608 [167 Cal.Rptr. 326].) By his own admissions to O'Hildebrandt, Mendez possessed her ring while knowing it had been stolen from her, and moreover, tried to sell it to her for the price of the pawn ticket. Thus, he was a "person who . . . receives any property which has been stolen . . ., knowing the property to be stolen," and he did his best to be a "person who . . . sells . . . any such property . . . knowing the property to be so stolen. . . ." (Pen. Code, § 496, defining the crime of receiving.)

The fact that Mendez was arrested for extortion, as well as receiving, is of no consequence. ■ "The fact an officer may place a person under arrest for the wrong offense does not invalidate the arrest and require exclusion of evidence seized incident to the arrest, if the officer nonetheless had probable cause to arrest the person for another offense. [Citations.]" (*People* v. *Lewis, supra,* 109 Cal.App.3d 599, 609; *In re Donald L.* (1978) 81 Cal.App.3d 770, 775-776 [146 Cal.Rptr. 720].)

(b) Defendant argues that even if the circumstances surrounding Mendez' arrest were properly included in the Whitley and McCawley affidavits and considered by the magistrate in issuing warrants for their arrests, the magistrate should not have also considered Mendez' sworn testimony, since that testimony did not comply with Penal Code section 1526.[7] Absent that testimony, it is argued, there was no probable cause for the Whitley/McCawley arrests, therefore those arrests were illegal and their fruits should not have been used in the supplemental police report which led to the issuance of a warrant for *defendant's* arrest.

As we shall explain below (section I(c), *infra*), we agree that, absent the oral examination of Mendez, there was insufficient cause for issuance of the Whitley/McCawley warrants; other than the examination, the magistrate

---

[7]Section 1526 provides: "(a) The magistrate may, before issuing the warrant, examine on oath the person seeking the warrant and any witnesses he may produce, and must take his affidavit or their affidavits in writing, and cause same to be subscribed by the party or parties making same. [¶] (b) In lieu of the written affidavit required in subdivision (a), the magistrate may take an oral statement under oath which shall be recorded and transcribed. The transcribed statement shall be deemed to be an affidavit for the purposes of this chapter. In such cases, the recording of the sworn oral statement and the transcribed statement shall be certified by the magistrate receiving it and shall be filed with the clerk of the court. In the alternative in such cases, the sworn oral statement shall be recorded by a certified court reporter and the transcript of the statement shall be certified by the reporter, after which the magistrate receiving it shall certify the transcript which shall be filed with the clerk of the court."

had only Melekian's affidavit, which contained no showing that Mendez was credible or his information reliable. However, we find that the oral examination did comply with the requirements of section 1526 and was therefore entitled to consideration by the magistrate.

Section 1526 recognizes two forms of affidavit: (1) the traditional written affidavit; and (2) the sworn oral statement described in subdivision (b). According to this statute, the person seeking a warrant *must*, and other persons *may*, give an affidavit of one type or the other. Under subdivision (a), moreover, the magistrate may also orally examine the warrant-seeker and other persons in order to supplement the information given in their affidavits. Although the case law interpreting this statute is not entirely clear, we find that all statutory requirements were met here.

First, the requirement that the warrant-seeker (here, Melekian) give an affidavit was obviously met. The question is the status of the oral examination of Mendez.

If this examination was a *supplement* to Melekian's affidavit as described in subdivision (a) rather than the *equivalent* of an affidavit within the terms of subdivision (b), then we would question whether the magistrate was entitled to rely on it to provide probable-cause information that was lacking in Melekian's affidavit. Penal Code section 1527 says that the "*affidavit* or *affidavits* must set forth the facts tending to establish . . . probable cause. . . ." (Italics added.) (See also *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 87 [104 Cal.Rptr. 226, 501 P.2d 234].)

However, if the examination was itself equivalent to an affidavit under subdivision (b), then the magistrate was entitled to rely on it to the same extent as a written affidavit. (See *People* v. *Peck* (1974) 38 Cal.App.3d 993 [113 Cal.Rptr. 806].) ▮ Defendant argues that the examination cannot be deemed the equivalent of an affidavit, because per *Theodor, supra,* and *Powelson* v. *Superior Court* (1970) 9 Cal.App.3d 357, 360-61 [88 Cal.Rptr. 8], an oral affidavit must be made in narrative form, rather than the question and answer format used here.

We disagree. *Powelson* interpreted section 1526 before it was amended to add subdivision (b), i.e., when it was composed solely of what is now subdivision (a). At that time, the statute made no provision for taking an oral statement in lieu of a written affidavit. In holding that the statute required a written "affidavit (not a question and answer type of proceeding)" (*id.,* at p. 361), the *Powelson* court was simply stating the obvious according to the statute as *then* written. The discussion in *Theodor,* which was decided after the Legislature added subdivision (b), is less clear. However,

in quoting *Powelson*'s interpretation of the statute, the *Theodor* court may have been saying not that a question and answer format is necessarily inappropriate under subdivision (b), but rather, that it is inappropriate where, as in *Theodor,* the question and answer session is "unreported and unsubscribed." (*Theodor* v. *Superior Court, supra,* 8 Cal.3d at pp. 86-87.)

Here, as required by subdivision (b), the oral examination was made under oath, reported and transcribed, then certified by the magistrate and filed with the clerk of the court. Moreover, it is apparent to us that the question and answer format, which effectively amounted at times to searching cross-examination, better equipped the magistrate to evaluate Mendez' credibility than would have a narrative-type statement in which Mendez could have controlled and limited the scope of his revelations. We conclude that this type of format is permitted by subdivision (b) as long as all formal requirements of the subdivision are met, as they were here.

Since we hold that Mendez' oral examination was equivalent to an affidavit under subdivision (b), we need not consider defendant's secondary contention that a magistrate who examines an informant under subdivision *(a)* must examine the affiant police officer as well.

(c) Defendant also argues that, even taking the oral examination into account, the information provided to the magistrate in support of the Whitley/McCawley warrants still fell short of establishing probable cause.

Defendant first criticizes the form of the written affidavits, in which all information that might constitute probable cause was contained in unsworn attachments rather than in the body of the affidavits themselves. Defendant relies on *People* v. *Murgia* (1974) 43 Cal.App.3d 85, 86 [117 Cal.Rptr. 564], where the court "particularly criticized . . . the use of unsworn 'attachments' which are then to be incorporated by reference into a sworn statement." She also cites *Kaylor* v. *Superior Court* (1980) 108 Cal.App.3d 451 [166 Cal.Rptr. 598] where, in addition to the use of unsworn attachments, some of the attached police reports were illegible and the magistrate failed to read all of them before issuing the warrant. Neither of these cases, however, held that unsworn police reports incorporated by reference in an affidavit cannot constitute probable cause as a matter of law. We think that *Kaylor* implies the contrary, since in quashing the warrant the reviewing court relied upon its inability to say *which* of the attached police reports the magistrate evaluated in finding probable cause. *Murgia* itself held the warrant invalid not because of the use of unsworn attachments in the affidavit, but because the affidavit was not signed until after the warrant issued.

Thus, the deciding factor in these two cases was not the use of unsworn police reports per se, but the clear indication that the magistrates failed to perform their required function of passing upon all facts supporting probable cause prior to issuing the warrants. In other words, neither case held that the incorporation of unsworn attachments in a sworn affidavit necessarily precludes a magistrate from relying on the factual contents of the attachments.

We agree with *Murgia* that the better practice is for police to refine and rewrite their original police reports as sworn affidavits, rather than to collect them as motley appendages to a form affidavit. But we see no reason to extend *Murgia's* criticism of the latter practice to a per se rule of invalidity. Here each of the police reports stated the source of the information they contained, be it statements of O'Hildebrandt, those of Mendez, or observations of various police officers. Since all sources were identified, the magistrate had an adequate basis to tell whether or not they could reasonably be relied upon. Therefore, we have no cause to hold that the form of the affidavits rendered the magistrate's reliance on their content unreasonable as a matter of law.

Contrary to defendant's contention, this case is not like *People* v. *Sesslin* (1968) 68 Cal.2d 418 [67 Cal.Rptr. 409, 439 P.2d 321], where the affidavit for an arrest warrant contained *no* underlying facts supporting probable cause; here such facts were present in the attachments. Rather, this case is like *People* v. *Jordan* (1984) 155 Cal.App.3d 769 [203 Cal.Rptr. 172], where the court held that to quash a warrant merely because all probable-cause information was contained in unsworn attachments would unduly place form over substance. We, similarly, decline to place such form over substance here.

Secondly, all questions of form aside, defendant contends that the *content* of the written affidavits and oral examination was insufficient in that there was no showing that Mendez was credible or his information reliable. Defendant relies upon the second prong of the *Aguilar-Spinelli*[8] test, which requires that an affidavit based on an informant's statements contain factual information from which a "magistrate . . . can reasonably conclude that the informant was credible or his information reliable." (*People* v. *Hamilton* (1969) 71 Cal.2d 171, 180 [77 Cal.Rptr. 785, 454 P.2d 681].)[9]

---

[8] *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509]; *Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584].

[9] Again, as this case arose before Proposition 8, the Supreme Court's subsequent retreat from *Aguilar-Spinelli* principles (*Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed. 527, 103 S.Ct. 2317]) is immaterial here. (*People* v. *Kershaw* (1983) 147 Cal.App.3d 750, 754, fn. 2 [195 Cal.Rptr. 311].)

■ Under *Aguilar-Spinelli,* if as here, the informant is neither a "citizen informant" nor has provided reliable information in the past, his credibility and reliability cannot be assumed, but must be shown by independent facts tending to connect the persons he is incriminating to the crimes he accuses them of. (*People* v. *Schmidt* (1980) 102 Cal.App.3d 172 [162 Cal.Rptr. 171]; *People* v. *Magana* (1979) 95 Cal.App.3d 453, 463 [157 Cal.Rptr. 173].) Here, we agree with defendant that nothing in the information provided to the magistrate—except for Mendez's own statements to O'Hildebrandt, the police and the magistrate—tends to connect Whitley or McCawley to the crimes. Thus, if the *Aguilar-Spinelli* test is applicable here, there was insufficient corroboration of Mendez' statements and the warrants should therefore not have issued.

In reliance upon *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144 [81 Cal.Rptr. 613, 460 P.2d 485], however, we find that the second prong of the *Aguilar-Spinelli* test does not apply to this case. In *Skelton,* the second prong was held not to apply where a suspected accomplice whose statements were relied on for issuance of a warrant personally swore out an affidavit and signed it in the presence of the issuing magistrate. The court distinguished such a situation from that where the informant does not appear in person before the magistrate, since the informant's appearance gives the magistrate a "full opportunity to observe his appearance and demeanor and to question him regarding any relevant matter if he considered this necessary to assure himself of the [informant's] credibility." (*Id.,* at p. 152.) Thus, although the *Skelton* magistrate was provided with no corroboration of the informer's statements, the court held that such corroboration was unnecessary in view of the magistrate's opportunity to assess credibility in a face-to-face confrontation. Essentially, the court relied on the proposition that "it is for the magistrate to determine the credibility of witnesses and affiants providing information under oath." (*Id.,* at p. 154, fn. 7.)

Since the magistrate expressly found Mendez to be credible, it is unnecessary to consider the contentions that the material provided by Mendez, in and of itself, gave indicia of credibility.

(d) Defendant next argues that, assuming the sufficiency of the affidavits and oral examination, the Whitley and McCawley warrants must still be quashed because the record shows that the magistrate failed to read *all* of the materials incorporated in the written affidavits. As we have seen, the reading of *all* such materials is mandatory. (*Kaylor* v. *Superior Court, supra,* 108 Cal.App.3d 451, 457.)

■ We apply the rule that " 'absent some palpable indication to the contrary, it is assumed the magistrate considered all the material presented

him in support of an application for a . . . warrant. [Citation.] This assumption is not indulged where substantial irregularity appears on the face of the record. . . .'" (*People* v. *Jordan, supra,* 155 Cal.App.3d 769, 778.)

Defendant has failed to show any substantial irregularity to rebut the presumption that the magistrate fully read the affidavits. In *Kaylor,* the magistrate testified that he had not done so. Here, a police officer testified that he had and the record does not belie that testimony. On the contrary the affidavits, on their face, were signed by Melekian at 10 p.m., in accordance with the testimony that they were prepared, then read in their entirety by the magistrate and signed in his presence, all after the oral examination of Mendez.

Defendant argues that the fact the affidavits were prepared *after* the oral examination somehow shows that the magistrate did not fully read them. We fail to see how. There was ample time between 5:30 and 10 p.m. for the examination, preparation, full reading and signing.

Defendant also appears to argue that the magistrate's failure to read all of the attachments is demonstrated by a typed date and hour of preparation on one of the police reports. The first page of this report shows a time, in typewriting, of 4 p.m., June 9, while a subsequent page of the same report recounts information assertedly obtained at 5:30 and 10 p.m. All this means to us, however, is either that the "4 p.m." notation is a typographical error or that the main body of this particular police report was prepared at 4 while the information recounted on its latter pages was added subsequently, as that information became available. Since the entire police report was incorporated in affidavits which, on their face, were subscribed and sworn to at 10 p.m. in the magistrate's presence, there is no reason to suspect malfeasance of the type defendant suggests. The only important question here is whether the record indicates that the magistrate did not read the reports in their entirety or that some of the reports were not presented to him until after he issued the warrants. (*Kaylor* v. *Superior Court, supra*; *People* v. *Murgia, supra.*) The mere indication of the possibility (and not given the certainty) of a typographical error here can hardly be construed as such indication.

(e) Next, defendant challenges the sufficiency of the affidavit for her *own* arrest warrant on several grounds. Insofar as she relies upon the same defects which assertedly invalidated the Whitley/McCawley affidavits, we have seen that no such defects exist. Moreover, the supplemental police report which was attached to the affidavit in her case was not, as she asserts, the fruit of the illegal arrest of Whitley, since we have held that Whitley's arrest warrant was valid.

Defendant also attacks the supplemental police report on the grounds that it contains information obtained in the early morning hours of June 10 (i.e., relating to the Whitley/McCawley arrests and the trip to the storage locker) while the form-affidavit which incorporated this report is dated one day earlier, June 9. However, we find no sinister meaning in this juxtaposition of dates. While the signature page of the affidavit bears a typed date of June 9, the magistrate's signature appears at the bottom, affirming that the affidavit was "sworn to before me and subscribed in my presence at 4:36 a.m. on June 10." It is therefore apparent—as borne out by the contents of the supplemental police report and the testimony at the suppression hearing— that the affidavit was originally prepared and presented to the magistrate on June 9, (thus explaining the typed date) that the magistrate then declined to issue a warrant, that the supplemental police report was incorporated into the affidavit in order to inform the magistrate of the fruits of the Whitley arrest, and that on the basis of this supplemental information, the reconstituted affidavit was presented to the magistrate at about 4:30 in the morning when it was sworn and subscribed in his presence and the warrant issued. We find no hint of illegality in this scenario.

Finally, recognizing that the only information in the supplemental report that incriminated her consisted of the statements Whitley made while under arrest, defendant contends that these statements could not be reasonably relied upon by the magistrate, since Whitley was an apparent accomplice and criminal informant who obviously was trying to curry favor with the police. ■ We agree that Whitley's status as a criminal informant rendered her statements unreliable; therefore, they could not *alone* constitute probable cause for defendant's arrest. However, the magistrate also had the benefit of Mendez' assertion that McCawley had admitted that she and defendant had committed the crimes, plus O'Hildebrandt's assertion that defendant was in her house (i.e., at the crime-scene) during both the October and January burglaries under circumstances which gave O'Hildebrandt some reason to suspect her. The statement of one unreliable informant can constitute adequate corroboration of another if the two informants are interviewed independently. (*People* v. *Green* (1981) 117 Cal.App.3d 199 [172 Cal.Rptr. 582].) Here, Whitley's statement that defendant and McCawley committed the crimes adequately corroborated the other information that tended to implicate defendant, and in combination they therefore made up probable cause for her arrest.

(f) Next, assuming the affidavit for defendant's arrest was valid on its face, defendant contends that it suffered from material omissions regarding Mendez' reliability and an intentional misstatement regarding the harm done to O'Hildebrandt.

The following material omissions are alleged: (1) Mendez was once arrested for being in a stolen car and he told Officer Melekian that he had been in jail many times; (2) at the time Mendez testified before the magistrate in this case, he was on probation for pickpocketing; (3) he told Officer Melekian that around the time he was negotiating with O'Hildebrandt for the return of her ring, defendant accused him of blackmailing her and she reported the alleged blackmail to the authorities. The asserted falsehood in the affidavit is Melekian's statement that Officer Craig Brown told him that O'Hildebrandt's doctor stated on January 9 that O'Hildebrandt had been given an opiate in a dosage that would have proved fatal had her circulation not been restricted by bindings during the crime.

■ The following rules apply: Upon proof that an affidavit for a warrant contains a falsehood or omission of a material fact (i.e., a fact where omission renders the affidavit substantially misleading), the warrant must be quashed if the falsehood was reckless or intentional, or if the omission was made with intent to deceive. If the affiant was merely negligent, however, the affidavit must be retested for probable cause after excision of the falsehood or insertion of the omitted material fact, as the case may be. (*People v. Kurland* (1980) 28 Cal.3d 376 [168 Cal.Rptr. 667, 618 P.2d 213]; *People v. Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130]; *Theodore v. Superior Court, supra,* 8 Cal.3d 77.)[10]

■ Here, the facts that Mendez had been jailed many times, was once arrested for being in a stolen car and was on probation during his involvement in this case, were not material omissions in view of the other facts presented to the magistrate regarding his background and current status. In *Kurland, supra,* the court held that the details of an informant's criminal record and police history were not material where his criminal involvement was otherwise reasonably apparent from the affidavit's description of him as a tipster in many drug cases. Here, too, Mendez' criminality was apparent: in the oral examination, Mendez admitted that he had been "in trouble a lot before" and had recently spoken to his probation officer. Both the examination and Melekian's affidavit revealed that Mendez was under arrest for extortion and receiving in the present case. Defendant herself concedes that the affidavit (if read by the magistrate) made it "immediately apparent that [Mendez] was inherently unreliable." Thus the details of his previous arrests were not necessary to make that unreliability apparent. As to Mendez' probationary status, not only was it implied by his reference to his probation officer during the examination, defense counsel conceded at the suppression hearing that the magistrate was aware of it. The probationary

---

[10]Although federal law differs in some respects, the California rules apply to this case. (*People v. Smith, supra,* 34 Cal.3d 251.) (See fns. 6 and 8, *ante.*)

status, unlike the details of the previous arrests, was of course material, but it was not omitted from the information supplied to the magistrate.

 Defendant's alleged accusation that Mendez was blackmailing her is a different matter. It was both omitted *and* material: "[W]hen the affiant knows or should know of specific facts which bear adversely on the informant's probable accuracy *in the particular case,* those facts must be disclosed." (*People* v. *Kurland, supra,* 28 Cal.3d at p. 395, italics in original.) It is obvious that defendant's accusation provided Mendez with a motive to retaliate, perhaps by making trouble for her with the police and therefore bore adversely on his probable accuracy in this "particular case."

However, defendant had the burden of proving at the suppression hearing that this omission was reckless or intentional, as opposed to merely negligent. (*People* v. *Cook, supra,* 22 Cal.3d 67.) Since she made no attempt to meet this burden, we shall assume that the omission was negligent and apply the appropriate remedy of adding and retesting for probable cause. Once the blackmailing material is added, it appears to be, as the trial court recognized, a double-edged sword. On the one hand, it does tend to indicate that Mendez had good reason to be biased against defendant, but on the other, since the blackmailing allegedly occurred around the time of Mendez' purported discovery of defendant's involvement in the crimes, it also tends to show that Mendez may have been blackmailing her about that involvement. We think these indications, when considered together, could reasonably cancel each other out so as to not make Mendez' story less credible than otherwise. The trial court so ruled, and, finding its reasoning entirely plausible, we have no reason to overturn that ruling.

As to the asserted falsehood regarding the opiate, defendant has not proven the affidavit to be false. She points to testimony at the preliminary hearing (which the trial court considered at the suppression hearing) that O'Hildebrandt's original attending physician had no memory of discussing her condition with any police officers and had not seen the urine tests which disclosed the presence of the opiate until substantially after January 9. But the preliminary hearing testimony also discloses that the tests did in fact come back positive for opiates around January 9, and there is no indication in the record that Officer Brown did not discuss them on that date with another of O'Hildebrandt's physicians. Brown was never asked whether he did or did not. Since the possibility that he did remains open, no falsehood has been demonstrated.

(g) Finally, defendant argues that, even if her arrest was lawful, the items of property recovered when the warrant was served should have been sup-

pressed because, although she consented to the search of her home, the search began before she consented and her consent was otherwise coerced. Again, however, the record does not bear her out.

The arresting officer testified that upon serving the arrest warrant they requested and obtained defendant's consent to search, meanwhile having observed several of the stolen items (whose descriptions they had previously received from O'Hildebrandt) in plain view in the house. When requesting defendant's consent, they told her that she could refuse, in which case they would try to obtain a search warrant.

As to defendant's first contention, this testimony shows that before consent was obtained, there was no "search" but rather, an observation of stolen property made while the officers were lawfully serving the warrant. An observation made from a location where police have the right to be does not constitute a search, and invades no constitutionally protected privacy interest. (*People* v. *Rogers* (1978) 21 Cal.3d 542 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People* v. *Kilpatrick* (1980) 105 Cal.App.3d 401 [164 Cal.Rptr. 349].)

As to the second contention, the only two California cases that are in point have found that consent to search is not necessarily rendered involuntary by the requesting officers' advisement that they will try to get a search warrant should consent be withheld. (*People* v. *Ruster* (1976) 16 Cal.3d 690 [129 Cal.Rptr. 153, 548 P.2d 353, 80 A.L.R.3d 1269]; *People* v. *Ward* (1972) 27 Cal.App.3d 218 [103 Cal.Rptr. 671].)

Nor does the Ninth Circuit case relied upon by defendant state otherwise. (*United States* v. *Ocheltree* (9th Cir. 1980) 622 F.2d 992.) *Ocheltree* held a consent to search involuntary where the officer's advisement that he would seek a warrant should consent be withheld was made while the defendant was temporarily detained in an airport just before his plane was scheduled to leave. The court reasoned that, under these circumstances, the advisement implied that if consent were withheld the defendant would be prevented from boarding and forced to remain under detention while the warrant was sought. Since the circumstances did not justify more than a brief detention, that implication amounted to an assertion of authority that the officer in fact did not have. The court distinguished such a situation from that where the circumstances raise no implication that the police are threatening action exceeding their actual authority. (*United States* v. *Agosto* (9th Cir. 1974) 502 F.2d 612.) The present case is like *Agosto* rather than *Ocheltree,* in that the officers did not threaten, expressly or impliedly, to do anything more than what they had a right to do.

In sum, we find no substantial defect in any of the circumstances leading to defendant's arrest and the search of her home. Consequently the stolen property found there was properly admitted into evidence.

## II

Defendant contends that the prosecutor committed reversible misconduct during closing argument by (a) stating that the presumption of innocence no longer applied and (b) casting personal aspersions on defense counsel. We find that none of the complained-of remarks were misconduct.

(a) At the end of summation, the prosecutor said: "And before this trial started, you were told there is a presumption of innocence, and that is true, but once the evidence is complete, once you've heard this case, once the case has been proven to you—and that's the stage we're at now—the case has been proved to you beyond any reasonable doubt. I mean, it's overwhelming. *There is no more presumption of innocence.* Defendant Goldberg has been proven guilty by the evidence. Thank you." (Italics added.)

Defendant likens this remark to the jury instruction condemned in *People v. T. Wah Hing* (1911) 15 Cal.App. 195, 199-200 [114 P. 416], which stated, contrary to the law, that the jurors should not abandon any conclusion of the defendant's guilt unless convinced of his innocence beyond a reasonable doubt. The court reversed, holding that the instruction was a substantial infraction of the right to be presumed innocent.

The present case is not comparable. Here the prosecutor essentially restated, albeit in a rhetorical manner, the law as reflected in Penal Code section 1096 and CALJIC 2.90 that a "defendant in a criminal action is presumed to be innocent until the contrary is proved. . . ." The jury was instructed per CALJIC 2.90 and the prosecutor twice reminded it in argument that the government had the burden of proving guilt beyond a reasonable doubt.

It is true *Wah Hing* states that the presumption of innocence exists up until the final verdict is reached, rather than, as the prosecutor said here, only until the close of evidence in a persuasively prosecuted case. However, since CALJIC 2.90, which follows the prosecutor's interpretation rather than *Wah Hing*'s, is an accurate statement of the law as codified in section 1096, either *Wah Hing* is contrary to present law, or, as we believe, the difference between the two interpretations is fundamentally insignificant.

Once an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot

find the defendant guilty until and unless *they,* as the fact-finding body, conclude guilt was proven beyond a reasonable doubt. Since such a conclusion cannot be reached prior to deliberation and unanimous agreement, the CALJIC No. 2.90 and *Wah Hing* versions are essentially equivalent in effectively preserving the presumption up and until unanimous agreement is reached.

■■■ (b) At another point in argument, the prosecutor said: "Mr. Hirsch's [defense counsel]—it's his job. He's trying to get you confused about what some of the issues are. For example, the issue is not, with one example, with the lady and the horse statute. He talked on and on about, well, was it missing at one time, . . . The issue in the case, once Goldberg gets up there and says that Mr. [*sic*] O'Hildebrandt let her take it home, the issue is, did in fact Mrs. O'Hildebrandt give that to Goldberg to quote hold for her. It doesn't matter whether the lady and the horse was missing one day, and there another day returned after one burglary. That's not the issue. He's trying to sidetrack you in your deliberations."

Defendant likens this remark to those in *People* v. *Talle* (1952) 111 Cal.App.2d 650 [245 P.2d 633], *People* v. *Mason* (1960) 184 Cal.App.2d 317 [7 Cal.Rptr. 627], and *People* v. *Bain* (1971) 5 Cal.3d 839 [97 Cal.Rptr. 684, 489 P.2d 564] which the reviewing courts characterized as "bitter attack," "vilification," "malicious," "vicious" and unwarranted accusations of fabricating defense evidence. The remark here hardly rises to such status. Rather it is comparable to, though far more mild than those in *People* v. *Meneley* (1972) 29 Cal.App.3d 41, 60 [105 Cal.Rptr. 432]. There the prosecutor told the jury: "defense [counsel wasn't] honest with you"; he is " 'trying to throw "dust in your eyes." That is his job. He is doing an excellent job. [He is] an excellent attorney. My warning to you is not to let that dust get in your eyes. . . . It is my duty to point out to you the obvious attempt to mislead the jury. If he can get away with it, fine. Perfectly legal, perfectly ethical, and part of the duty of defense attorney. . . . Of course, again Mr. Lyons throws a lot of dust around, and again, you know, you can't try the law, you can't try the facts, you try the police.' "

The court held these comments to be "entirely within the range of proper comment by the prosecution on the evidence and credibility of witnesses, merits of the defense, and to argue all reasonable inferences." (29 Cal.App.3d at p. 60.)

A prosecutor may vigorously argue and is not limited to "Chesterfieldian politeness" in doing so. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144].) Here, the one isolated and rather mild

remark, although not polite to defense counsel, was not outside the bounds of permissible vigor. (*People* v. *Meneley, supra,* 29 Cal.App.3d 41.) Even if it were improper, it would not require reversal unless prejudicial under the *Watson* standard (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]), and this brief remark at the end of a long and complicated trial posed little danger of such prejudice.

## III

The crimes, and trial itself, attracted the interest of local news media. The trial judge, therefore, was especially adamant in cautioning the jurors to avoid discussing the case with outsiders or receiving information about it from any source. The judge reiterated these admonitions throughout the trial and urged the jurors to immediately report any violation to him. He stressed that, in order to return a fair verdict, the jurors had to decide the case solely on evidence adduced in court.

After several days of deliberation, one of the jurors, a Ms. Hellerman, reported that several other jurors had violated the admonition by discussing a news article about the case, the fact that Hector Mendez (who did not testify at defendant's trial) had testified before the McCawley jury and the fact that the McCawley jury had deadlocked. Hellerman told the judge that, in view of his admonitions about the necessity of avoiding exposure to outside information, she was extremely upset about these discussions and felt that they prevented her from being fair to both sides. She asked the judge to excuse her from the jury.

The judge told Hellerman that he would take her request into consideration. He then interrupted the deliberations and examined all jurors individually as to what outside information they had heard and discussed. Then, assembling the entire jury, he told them that the nature of the information they had received did not appear to have any significance, and he asked them if anyone felt unable to continue on the case uninfluenced by it. Apparently, only Hellerman raised her hand. After more in-chambers discussion with her, she stated that she could continue uninfluenced. Deliberations were resumed and the jury returned shortly thereafter with mixed verdicts of guilty on two counts and acquittal on another, with hopeless deadlock on the remainder.

Defendant argues that the trial court erred in (a) refusing to excuse Hellerman from the jury, and (b) denying the defense motion for mistrial based on juror misconduct.

(a) Penal Code section 1089 states that ". . . if a juror requests a discharge and good cause appears therefor, the court may order him to be

discharged and draw the name of an alternate, who shall then take his place in the jury box. . . ." As defendant points out, the requisite "good cause" has been found in a case where the juror requesting discharge stated his inability to be impartial due to his arrest during the trial (*In re Devlin* (1956) 139 Cal.App.2d 810 [294 P.2d 466]), and one where the juror "steadfastly" proclaimed her inability to follow the court's instructions (*People* v. *Collins* (1976) 17 Cal.3d 687, 696 [131 Cal.Rptr. 782, 552 P.2d 742]). Defendant seizes on language from *Collins* that the court had "little choice but to discharge [the juror]" in that case (*id.* at p. 676), and argues that the same holds here, since Hellerman was adamant for so long in her request.

■ We apply the following rule: the "trial court's discretion as to the determination of 'good cause' under [section 1089] . . . is bridled to the extent that the facts must 'show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality.' [Citations.] The court must not presume the worst. [Citations.]" (*People* v. *Franklin* (1976) 56 Cal.App.3d 18, 25-26 [128 Cal.Rptr. 94].) *Franklin* found no good cause to discharge a juror who ultimately recanted her initially claimed inability to judge impartially.

■ *Franklin* controls the instant case. Here, as in *Franklin*, the juror requesting discharge ultimately said that she could put the improper influences outside her mind and decide the case solely on the evidence. Defendant counters that Hellerman said these things only because of badgering by the court, but no tone of badgering appears in the record. On the contrary, the trial court commended Hellerman for reporting the misconduct of her fellow jurors, and tried to impress her with the fact that the violation of his admonitions did not mean that the trial was irredeemably tainted. Hellerman's response indicated that she was impressed by this reasoning, and implied that her initially felt inability to continue was caused by her misapprehension that any violation of the admonitions was incurable.

Since Hellerman's ultimate expression of confidence in her ability to judge impartially appears to be sincere and not the product of any intimidation or badgering, the facts here, as in *Franklin,* "clearly do not reach the required standard of an inability to perform the functions of a juror." (56 Cal.App.3d at p. 26.) The trial court therefore properly declined to discharge her.

(b) The individual examinations of the jurors disclosed that one or others of them knew not only that Hector Mendez had testified before the Mc-Cawley jury which then deadlocked, but also that the trial judge had been angry at the McCawley jurors. All this information had been received from

some of the McCawley jurors themselves and perhaps from a newspaper article as well.[11]

Defendant contends that the receipt of this information constituted misconduct on the part of her jurors and that the misconduct prejudiced her. Prejudice is shown, she argues, by Hellerman's emotional upset, by the implication that the court was angry at the McCawley jury *because* they had deadlocked (thus putting undue pressure on defendant's jury to reach a verdict and avoid similar wrath), and by the quick return of a verdict after deliberations were resumed.

■■ There is no question that it was misconduct for defendant's jurors to entertain discussion with the McCawley jurors about the status of their case. (See *People* v. *Kitt* (1978) 83 Cal.App.3d 834 [148 Cal.Rptr. 447].) ■■ Moreover, the misconduct was presumptively prejudicial: "It is well-settled that a presumption of prejudice arises from any juror misconduct. . . . In *Remmer* v. *United States* (1954) 347 U.S. 227, 229 [98 L.Ed. 654, 656, 74 S.Ct. 450], the United States Supreme Court stated: 'In a criminal case, any private communication, contact or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial. . . .' However, the presumption may be rebutted by proof that no prejudice actually resulted. [Citation.]" (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].)

■■ The only real question, therefore, is whether the presumption of prejudice was rebutted here by proof that no prejudice actually resulted. We hold that it was.

First, the knowledge that Mendez testified in McCawley's trial but not defendant's could not have been harmful under the circumstances here. On the day when, according to the clerk's transcript, Mendez testified in the McCawley case, the prosecutor said in the presence of *both* juries that his "next witness would only be in front of one of the juries." Presumably, defendant's jury then left the courtroom knowing that the prosecutor felt his next witness would be helpful in proving McCawley's guilt but not defendant's. Mendez had been mentioned as a potential witness in the prosecutor's opening statement. Under these circumstances, the information regarding Mendez received from the McCawley jury was essentially repetitive of what defendant's jurors already knew, and if anything, the implications of that

---

[11]Some of defendant's jurors admitted hearing mention of a newspaper article about the case, but they all denied having knowledge of its contents except for one juror who had heard that it reported the McCawley deadlock.

information was favorable to defendant. Had her jurors thought that Mendez testified for the McCawley defense, they might have speculated that McCawley had a defense which defendant did not. But since they knew Mendez was a *prosecution* witness, the natural conclusion to be drawn, if any was drawn at all, is that Mendez could incriminate McCawley but had nothing to say in proof of defendant's guilt.

Second, the knowledge that the McCawley jury deadlocked again, was potentially more favorable to defendant than not. The deadlock meant that, despite the testimony of an additional prosecution witness, the government's case against McCawley was problematic. Thus, no spectre of guilt-by-association[12] was raised, as would have occurred had defendant's jury learned that the McCawley jurors had returned a guilty verdict. On the contrary, the only one of defendant's jurors who mentioned the nature of the deadlock discussion told the court that the discussion was along the lines of "well, McCawley is a deadend or hung jury or whatever. And it looked like we should call this one that."

Nor is there any indication that the court's anger at the McCawley jurors was due to their inability to reach a verdict. None of defendant's jurors said that they thought so, and the only one who purported to know the reason for the anger said she understood that the judge was "upset with the McCawley jury and called them in individually to speak with them *about not reporting certain information.*" When the judge asked Hellerman if anyone had spoken to her about the fact that he strongly admonished the McCawley jury "with respect to incidents occurring *outside the jury* room," she responded that she had heard them complain that "the judge really gave it to us."

Consequently, defendant's speculation that her jurors feared that the court was angered over the deadlock appears unfounded. In view of the many admonitions to both juries not to discuss the case outside of the courtroom, it is far more likely that any juror who considered the reason for the court's displeasure concluded, as apparently did the two jurors quoted above, that the anger was due to the McCawley jurors "reporting certain information" to defendant's jurors "outside the jury room."

Fourth, although defendant's jury did return their verdicts shortly after deliberations resumed, the foreman told the court during the individual examinations that "we are about ready to make a decision." This rebuts de-

---

[12]Defendant's jury heard evidence that McCawley was a friend of defendant's, whom defendant had introduced to O'Hildebrandt shortly before the crimes. O'Hildebrandt's rude treatment of McCawley on that occasion may have engendered a motive to seek revenge.

fendant's suggestion that a rush to verdict was prompted by the "lengthy interrogation process." Moreover, we note that the mixed verdicts returned here are inconsistent with defendant's theory that the jurors were pressured either to find defendant guilty or to otherwise agree unanimously on all counts charged.

Finally, the fact that Hellerman was upset by the misconduct is insignificant. Since she was upset only because outside information had been received contrary to the court's admonition, she was particularly motivated to follow the admonition and judge the case solely on the evidence presented.

In *People* v. *Kitt, supra,* 83 Cal.App.3d 834, 852, juror misconduct in viewing photographs not introduced in evidence was held nonprejudicial because "not of a nature to have had any effect upon the jury's verdict." Since here the information received by the jury was of a nature that its effect on the verdict, if any, was favorable to defendant, we have all the more reason to hold, as we do, that the presumption of prejudice was rebutted.

The judgment is affirmed.

Woods, P. J., and McClosky, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 23, 1985.